NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 22, 2022

S22A0073.  GARAY v. THE STATE.

BETHEL, Justice.

After a jury trial in December 2019, Hector Garay was convicted of malice murder and other crimes in connection with the January 1996 shooting death of Adalberto Salinas. In his only enumeration of error on appeal, he contends that there was insufficient evidence to prove him guilty of the crimes charged beyond a reasonable doubt.[1] We disagree and affirm.

---

[1] The crimes occurred on January 21, 1996. On January 9, 2019, a Gwinnett County grand jury indicted Garay and Juan Jose Gomez as parties to the crimes of malice murder (Count 1), two counts of felony murder (Counts 2 and 3), criminal attempt to commit armed robbery (Count 4), aggravated assault (Count 5), and three counts of possession of a firearm during the commission of a felony (Counts 6-8). Garay was tried separately, and Gomez's case is not part of this appeal. At a trial held from December 9 to 12, 2019, the jury found Garay guilty of all charges. The trial court sentenced Garay to serve life in prison on Count 1; a term of 30 years on Count 4, to be served consecutively to Count 1; and a term of five years on Count 7, to be served consecutively to Count 4. Counts 2 and 3 were vacated by operation of law. At

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. At around 9:30 or 10:00 p.m. on Sunday, January 21, 1996, Mr. Salinas, who owned a store called El Norteño, returned home from dinner with his wife, Francisca. After walking in the front door of their home, Mr. Salinas secured the chain lock on the door while Mrs. Salinas began taking off her gloves and scarf. They then heard the door handle shake as though someone was trying to enter the front door. Mr. Salinas opened the door with the chain still latched, and gunshots were immediately fired through the front door into the home, striking Mr. Salinas in the head and neck and killing him. Mrs. Salinas saw a man, who was not very tall and who was wearing a ski mask, on the other side of the door.

---

the request of the State, the trial court vacated Count 6. The State has not challenged that determination on appeal, and we decline to address it sua sponte. See *Dixon v. State*, 302 Ga. 691, 696-698 (4) (808 SE2d 696) (2017). Count 5 merged with Count 1, and Count 8 merged with Count 7 for sentencing. Garay timely filed a motion for new trial on January 13, 2020, which he later amended through new counsel. Following a hearing, the court denied the motion as amended on June 16, 2021. Garay filed a timely notice of appeal. The case was docketed in this Court to the term beginning in December 2021 and submitted for a decision on the briefs.

A neighbor heard the shots, looked outside, and saw a two-door car drive by at a rapid speed. At the scene, the police recovered three 9 mm Luger shell casings that were all fired from the same firearm, as well as a black knit hat that was found on a neighbor's driveway. A little over $17,000 in cash was located in the Salinases' home.

On January 25, investigators learned that Edgar Quintanilla had information about the shooting. Quintanilla was interviewed by the police, and an audio and video recording of the interview was played for the jury. In the interview, Quintanilla told investigators the following. On January 19, the Friday before the shooting, he saw Garay's wife hand Garay a 9 mm firearm. When Quintanilla asked to whom the gun belonged, Garay said it was his. Garay then told Quintanilla that he needed it to do some "business" the following night, which he explained meant that he intended to rob someone who had a lot of money. Garay said he had some people ready to assist in the robbery and that he needed one more, and asked Quintanilla to help. Quintanilla declined. The next day, Garay asked Quintanilla to look at a car, and Quintanilla agreed. Garay

came to pick Quintanilla up in his Toyota Celica and asked Quintanilla to drive. Garay gave him directions to a gas station where they stopped, and Garay handed him a pistol, telling him that they were going to go do the "business right now." Quintanilla again declined. Garay agreed to drive Quintanilla home but drove him past the Salinases' house, where Garay again asked him to "go do the business." Quintanilla once again declined, and Garay drove him home, saying that he would do the "business" the next day instead.

Quintanilla spoke with Garay on the Monday following the shooting, and Garay told Quintanilla that he went to rob the man who owns El Norteño but that it "went wrong" and he ended up shooting the man "many times" with his 9 mm firearm, causing the others who were with him to run away. Garay told Quintanilla that he was going to leave the country because he was worried his Toyota Celica may have been identified at the scene. Based on the information Quintanilla provided, investigators identified Garay as a suspect. By that time, however, Garay had fled to El Salvador, where he was apprehended by the FBI in 2018.

Luis Villalobos, who lived with Garay and Garay's family at the time of the shooting, testified that Garay told him that a man named "Lobos" had shot someone. Another person, Ernie DeLeon, testified that Garay and a man known as "Boscoe"[2] talked about how they were going to rob someone for $50,000. Garay and Boscoe asked DeLeon if he had a dark sweater, beanie, or skullcap, as well as handcuffs. DeLeon gave them a sweater and a beanie and told them they could buy handcuffs. DeLeon testified that they also invited him to participate in the robbery, but he declined.

An investigator testified that he interviewed a nightclub manager and a bouncer, who said that they had seen Garay and Juan Gomez, also known as "Lobo," around 3:00 a.m. on January 21. The manager and bouncer said that Garay had a handgun in his waistband and that Gomez told them that he also had a gun.

Garay testified at trial and denied being involved in the shooting. According to Garay, he was drinking at a gas station with Santos Noe Martinez, Juan Lobo, and Ernie DeLeon when Lobo and

---

[2] "Boscoe" was later identified as Quintanilla by investigators.

DeLeon left on foot to commit the crimes. Garay claimed that he was in the gas station and had taken a beer and was warming up a burrito. Garay said that Martinez told him, "I heard some shots. There's been a shooting . . . it's them, it's them, let's go." Garay also testified that Martinez told him DeLeon and Lobo "fired" or "shot." Garay saw DeLeon walking down Jimmy Carter Boulevard but could not tell what house he was coming from. Garay claimed that DeLeon was the one who shot Mr. Salinas and that, following the shooting, Lobo threatened him in the car that if he said anything to police, he or his children would be killed because Garay "was the only one who saw what they did."[3] Garay also claimed that Quintanilla was mad at him and set him up because Quintanilla had stolen a phone "from a detective" where Garay worked cleaning offices, and Garay had told Quintanilla that he had been asked to return the phone within three days or else he would be fired.

2. Garay contends that the evidence was legally insufficient to

---

[3] As Garay landed at the airport in Atlanta upon his return from El Salvador, he said to an FBI agent, "I haven't been back in Georgia in 22 years. He told me he was going to kill my son."

support his convictions because he testified at trial to an alternative version of events on the evening of the murder and because there was no physical evidence connecting him to the crimes.[4] We disagree.

> When evaluating a challenge to the sufficiency of the evidence [as a matter of constitutional due process], we view all of the evidence presented at trial in the light most favorable to the verdict[s] and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted.

*Jones v. State*, 304 Ga. 594, 598 (820 SE2d 696) (2018) (citing *Jackson v. Virginia*, 443 U. S. 307, 318-319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979)). "We leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts, and we do not reweigh the evidence." (Citations and punctuation omitted.) *Harris*

---

[4] While Garay challenges the sufficiency of the evidence to sustain all of the guilty verdicts against him, his challenges to the counts other than malice murder (Count 1), criminal attempt to commit armed robbery (Count 4), and possession of a firearm during the commission of a felony (Count 7) are moot because those counts were merged or vacated by operation of law. See *Collett v. State*, 305 Ga. 853, 855 (1) n.2 (828 SE2d 362) (2019).

*v. State*, 313 Ga. 225, 229 (2) (869 SE2d 461) (2022).

Further, as a matter of Georgia statutory law, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. "Not every hypothesis is reasonable, and the evidence does not have to exclude every conceivable inference or hypothesis; it need rule out only those that are reasonable." (Citation and punctuation omitted.) *Cochran v. State*, 305 Ga. 827, 829 (1) (828 SE2d 338) (2019). Whether alternative hypotheses are reasonable, however, is usually a question for the jury, and this Court will not disturb the jury's finding unless it is insufficient as a matter of law. See *Graves v. State*, 306 Ga. 485, 487 (1) (831 SE2d 747) (2019). Moreover, if there is any direct evidence presented by the State, the circumstantial evidence statute does not apply to a sufficiency analysis. See *Jackson v. State*, 310 Ga. 224, 228 (2) (b) (850 SE2d 131) (2020).

The State presented some circumstantial evidence. For

instance, the State presented evidence that Garay was armed and planning a robbery around the time of the charged crimes, and that he fled to El Salvador and was not apprehended for over two decades, which was circumstantial evidence of Garay's consciousness of guilt. See *Landers v. State*, 270 Ga. 189, 191 (5) (508 SE2d 637) (1998) ("Generally, evidence of flight . . . [is] admissible as circumstantial evidence of consciousness of guilt.").

However, the State also presented direct evidence of guilt. In particular, Quintanilla testified that Garay confessed that he went to rob the man who owns El Norteño but that it "went wrong" and he ended up shooting the man "many times" with his 9 mm firearm, and that he was going to leave the country because he was worried his vehicle may have been identified at the scene. See *Howell v. State*, 307 Ga. 865, 870-871 (1) (b) (838 SE2d 839) (2020) (defendant's statements indicating involvement in a murder considered direct evidence). Accordingly, OCGA § 24-14-6 does not apply in this case. Moreover, to the extent Garay's arguments implicitly challenge the credibility of Quintanilla's testimony, it was

9

for the jury to determine whether and to what extent to believe Quintanilla's testimony about what Garay told him. See *Graves v. State*, 298 Ga. 551, 553 (1) (783 SE2d 891) (2016) ("[I]t is axiomatic that resolving evidentiary conflicts and assessing witness credibility are within the exclusive province of the jury."). Moreover, the jury was authorized to disbelieve Garay's testimony that he stayed behind at the gas station while DeLeon and Lobo committed the crimes, that Lobo threatened him into keeping quiet, and that he fled to El Salvador because he was afraid. See *Fitts v. State*, 312 Ga. 134, 143 (3) n.9 (859 SE2d 79) (2021) (noting that, if disbelieved by the jury, the defendant's testimony denying involvement in the crimes could have served as direct evidence of guilt); *Scott v. State*, 307 Ga. 37, 40 (1) (a) (834 SE2d 88) (2019) ("The jury was authorized to reject [the defendant]'s evidence and theory and resolve any conflicts in the evidence adversely to him.").

Additionally, although the State did not produce physical evidence from the crime scene that directly linked Garay to Mr. Salinas' death, that does not mean the evidence presented was

insufficient. "[A]lthough the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." (Citation omitted.) *Rich v. State*, 307 Ga. 757, 759 (1) (a) (838 SE2d 255) (2020). Moreover, the physical evidence recovered from the scene, including the 9 mm shell casings and the black cap, was consistent with Quintanilla's testimony about Garay's possession of a 9 mm firearm and a black cap.

Thus, viewed in the light most favorable to the verdicts, the evidence presented at trial supports the jury's guilty verdicts on the counts of malice murder, criminal attempt to commit armed robbery, and possession of a firearm during the commission of a felony and was therefore sufficient as a matter of due process. See *Jackson*, 443 U. S. at 319 (III) (B). Moreover, because the State presented direct evidence of Garay's guilt, the requirements of OCGA § 24-14-6 do not apply. Garay's challenge to the sufficiency of the evidence therefore fails.

*Judgment affirmed. All the Justices concur.*