NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided:  October 25, 2022

S22A0511.  DRENNON v. THE STATE.

WARREN, Justice.

Appellant Carlos Drennon appeals from his convictions for malice murder and participation in criminal street gang activity stemming from the shooting death of Randy Griffin.[1]  On appeal,

---

[1] Griffin was killed on June 10, 2007.  On June 27, 2008, Drennon and 11 other defendants were charged in a 60-count indictment returned by a Fulton County grand jury.  Drennon was indicted on 15 counts and was jointly tried with Tiffany Bankston, Maurice Hargrove, Edward Morris, and Daquan Stevens for five crimes arising from the shooting death of Randy Griffin on June 10, 2007: malice murder, conspiracy to commit murder, felony murder predicated on aggravated assault, aggravated assault, and possession of a firearm during the commission of a felony.  Those five defendants, along with Vincent Morris (Edward Morris's brother), were also charged with criminal street gang activity for crimes of violence that occurred between September 2006 and October 2007.  In addition, Hargrove, Stevens, and Edward and Vincent Morris were tried on four other counts relating to crimes committed against Griffin and Lacey Magee that occurred on May 22, 2007.  In August 2007, before the indictment was returned in the case that is before us now on appeal, Drennon pled guilty to two counts of aggravated assault arising from the May 22, 2007, incident.

In May 2009, a jury found Drennon not guilty of the firearm offense but convicted him of the remaining crimes.  On May 5, 2009, the trial court

Drennon contends, among other things, that the evidence is insufficient to support his convictions, that the trial court erred in denying his motion to sever his trial from that of his co-defendants, and that he was denied his right to be present at trial when he was

---

sentenced Drennon to life in prison for malice murder and to 15 consecutive years in prison for criminal street gang activity. The felony murder count was vacated by operation of law, and the trial court merged the other counts for sentencing purposes. On May 28, 2009, Drennon filed a motion for new trial, which he amended with new counsel in January and September 2015. In 2014, the trial court placed any open counts remaining against Drennon on the dead docket. On January 13, 2020, the trial court denied Drennon's motion for new trial, as amended. On January 24, 2020, Drennon filed a notice of appeal, and the case was docketed in this Court to the August 2021 term. However, because the counts of the indictment against Drennon that were dead-docketed by the trial court meant that Drennon's case remained pending in the trial court, he was required to follow the procedures for interlocutory appeal to obtain review of his convictions. See OCGA § 5-6-34 (b); *Seals v. State*, 311 Ga. 739 (860 SE2d 419) (2021); *Spears v. State*, 360 Ga. App. 776 (861 SE2d 619) (2021). On August 6, 2021, we dismissed Drennon's appeal because he failed to follow those procedures.

On remand, the State was unwilling to dismiss the unresolved dead-docketed charges. On November 9, 2021, the trial court therefore vacated its January 13, 2020, order denying Drennon's motion for new trial, entered a new order denying that motion, and granted Drennon a certificate of immediate review. Drennon filed an application for interlocutory appeal, which we granted on December 9, 2021. Drennon thereafter filed a timely notice of appeal, see OCGA § 5-6-34 (b), and the case was docketed in this Court to the April 2022 term and orally argued on April 21, 2022. This Court has already affirmed the convictions of Edward Morris and Stevens, both of whom were convicted of murder, criminal street gang activity, and other crimes. See *Morris v. State*, 294 Ga. 45 (751 SE2d 74) (2013); *Stevens v. State*, 286 Ga. 692 (690 SE2d 816) (2010). The Court of Appeals has affirmed the convictions of Vincent Morris for criminal street gang activity and other crimes. See *Morris v. State*, 322 Ga. App. 682 (746 SE2d 162) (2013).

2

not included in certain bench conference discussions.

We conclude that the evidence is sufficient to support Drennon's convictions for malice murder and for participating in criminal gang activity and that the trial court did not fail to exercise its discretion as the "thirteenth juror" when ruling on the general grounds of Drennon's motion for new trial, so we affirm those parts of the trial court's judgment. However, because Drennon's right-to-be-present claim was raised for the first time on appeal and because, as more fully explained below, we cannot easily reject that claim on the existing record, see *Champ v. State*, 310 Ga. 832, 844 (854 SE2d 706) (2021), we vacate the trial court's judgment in part and remand the case for the trial court to hold a hearing and rule on Drennon's constitutional claim in the first instance. We therefore do not address Drennon's remaining enumerations of error.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed the following. The "International Robbing Club," or "IRC," was "a loosely affiliated group of friends and associates who planned and executed so-called 'licks,' robberies

3

of individuals believed to possess significant amounts of cash, drugs, jewelry, and other high value items." *Morris v. State*, 294 Ga. 45, 46 (751 SE2d 74) (2013). Marciell Easterling, a co-indictee who testified at Drennon's trial under an immunity agreement, was present when the IRC was formed in late 2005 or early 2006. He testified that Daquan Stevens, Edward Morris, and Jeremy Dunn were original members of the group and that Drennon, Maurice Hargrove, and Vincent Morris joined later. According to Easterling, the group would "hang out" and "plan things" like robberies. He added that the IRC would get "money, drugs, jewelry, guns[, and] merchandise" from the robberies. Tiffany Bankston testified that Drennon told her that he had participated in "licks" with Easterling and Stevens. Members of the IRC, including Drennon, discussed robbing Griffin after Edward Morris saw him at a nightclub wearing Breitling-brand jewelry.

In the early morning hours of May 22, 2007, members of the IRC received information that Griffin was at a nightclub in Atlanta. Drennon, Hargrove, and the Morrises drove to the nightclub in one

4

car, while Easterling, Stevens, and a third IRC member, Jonathon Collins, drove there in a second car. Members of the IRC knew where Griffin lived, and once he left the nightclub, Drennon's group drove ahead of Griffin to wait for him at his residence. Meanwhile, Easterling's group followed Griffin. "When Griffin and [Lacey] Magee, his girlfriend, pulled into Griffin's driveway and exited their cars, shots were fired at them from a gold Toyota Avalon occupied" by Drennon's group. *Morris*, 294 Ga. at 46. "Magee was shot in the hand, and Griffin returned fire. The Avalon drove off, with both Drennon and Vincent Morris having been shot." Id. Easterling's group did not go into Griffin's condominium complex, but instead parked on a road near the entrance. After they heard the gunfire in the complex, they saw a person run across the road. Unsure of who it was, Easterling, who was driving the car, drove forward. The person was Griffin, and he ran up to Easterling's car. Collins told Griffin to get in, and he did. Panicked and unaware that the occupants of the car were part of the group trying to rob him, Griffin told the people in the car that someone had tried to rob him and had

shot his girlfriend. Griffin had a gun in his hand. According to Easterling, the car's occupants were also carrying guns, but they were on the floor of the car, so there "wasn't no way that we could reach for our gun to do anything to him." About that time—which was only about 30 seconds later—the Avalon in which the other members of the group were riding "skidded out of the parking lot" of Griffin's complex. Griffin got out of the car Easterling was driving and started shooting at the Avalon; he then ran back toward his condominium. "Following the incident, Magee and Drennon were treated for their injuries at the same hospital, and Griffin, who had accompanied Magee to the hospital, identified Drennon as one of their assailants, leading to Drennon's arrest." Id. at 46.

Drennon was in jail based on his arrest for the May 22, 2007, crimes against Griffin and Magee, when "in the early morning hours of June 10, 2007, Griffin was shot and killed outside Club 112, a Midtown nightclub." Id. When Griffin was killed, he was wearing a Breitling necklace and bracelet.

At trial, Easterling "testified that IRC members . . . had

6

planned Griffin's murder to retaliate for Drennon's arrest," id. at 46-47, and that

> [Easterling] had heard Morris recount how he and others drove to Club 112 on the night of the murder and waited for Griffin to emerge, at which point two of Morris' confederates fired at Griffin. Morris' presence at the scene of the murder was corroborated by cell tower triangulation evidence placing Morris' cell phone at the crime scene at the time of the shooting. In addition, a former girlfriend of Morris told police that Morris had told her he had been present when Griffin was killed and that Hargrove had been the triggerman.

Id. 47. Bankston, who pled guilty to criminal street gang activity, testified that she started dating Drennon in 2006 and that they were engaged to be married at the time of trial. According to Bankston, when Griffin was robbed in May 2007, Easterling and Stevens told her that someone had "jumped out too fast" that night, implying that the group driving with Easterling might have killed Griffin that night if they had the chance.

Bankston participated in a number of three-way calls with Drennon and his friends while Drennon was in jail; code words and phrases were often used during these calls. She testified that,

during these calls, Drennon and his friends referred to "watching the news." At first, she did not know what they were talking about, but she later began to understand what Drennon meant when he said that the "n***** tried to identify me." Bankston also testified that, on the day Griffin was killed, Easterling and Stevens came to her house and told her about the shooting and asked her to tell Drennon. Bankston testified that she later called Drennon in jail and told him that "Auntie Monique" had killed her husband at Club 112, which was "code" that "[Hargrove] shot Randy Griffin."

While Drennon was in jail between May 22 and June 10, he frequently initiated calls with his IRC associates. Those calls were recorded, and many were introduced into evidence at trial. For example, in a conversation on May 23, Drennon asked Hargrove "how that other dude was doing" and told Hargrove that he (Drennon) was "f**ked up" and that "the n***** tried to identify a n***** and how's that." Hargrove responded "be cool and just watch the news."

Drennon spoke to Hargrove again on May 27, and Hargrove

8

said, "[w]hy the ho lay up there and flag them and got in the back of the car with them"?  Drennon asked, "[g]ot in the back of the car with [Easterling]"; Hargrove responded, "yeah," and said "why the ho lay up there and go out" and "they still ain't f**k the ho." Hargrove continued, saying that "you ain't got nothing to worry about, man. . . . [N]***** like on top of the ho.  N***** going to f**k the ho, man."  Drennon then told Hargrove that he was "sweatin' that ho" and "I just got to depend on you. . . .  Go on ahead and lay that ho on out for me."  Hargrove then said, "You already know that. Man, that's my word.  I'm a f**k the s**t out that ho."

In another conversation later that night, Drennon told Stevens that he had been "trying to figure out what's going on, man, you know what I'm saying?  I've been watching the motherf**king news and s**t, you know what I'm saying.  Ain't s**t going on on the f**king news."  Stevens reassured Drennon that "that news going to come up," and Drennon asked, "when it going to come up," and later said "god da*n go get that girl, man, god da*n hurry up."  Stevens acknowledged that "they need to hurry up"; "n***** just running

9

around here shooting people and get away with it."

In a conversation that took place from jail on June 2, Drennon spoke with Edward Morris. Drennon told Edward that, when he was in the hospital, "some dude came in there and identified me. Talking about I robbed him." Drennon then asked Morris if he had "seen the girl." Morris responded that "the girl jumped in the car . . . and everything" and that he would "have slapped that whore in her f**kin mouth." Morris added that "she hopped" out of the car and tried to flag other cars down. Drennon then said that, "so you tellin' me all of that could have been stopped right then and there"? Morris responded that it "could have been stopped," and Drennon said that he did not "even want to talk about it."

During a June 7 conversation with Easterling from jail, Drennon asked Easterling if "everything straight," had "y'all . . . heard nothing," and had they "seen ol' girl." Easterling responded that they "ain't heard nothing" and had not seen "ol' girl" because "she had moved" and that they "[g]ot to confirm where she stay at." Drennon then said he was "just checking on it." At trial, Easterling

10

testified about this conversation, explaining that "ol' girl" was the name he and Drennon used for Griffin and that he and Drennon had been discussing Griffin when they discussed "ol' girl."

On June 10, at 12:40 p.m., which was after Griffin was shot and killed, Drennon called Bankston from jail. Bankston told him that Easterling had called her "about an hour or so ago" and told her that she needed to "meet up with him." Drennon told her to "call [Easterling] and see what's up." Bankston called Easterling and connected Easterling into her call with Drennon. When Drennon asked Easterling what was going on, Easterling responded that he could not talk to Drennon at that point; Drennon asked the same question again. Easterling responded, "Oh s\*\*t you, uh, what y'all looking at on the tv"? Drennon said, "I need to look at the news." Bankston asked Easterling where she was supposed to meet him.

Shortly thereafter, Drennon made a phone call to his father. Drennon asked his father if he had "watch[ed] the news." His father responded that he had not, and Drennon said, "Dang," "I need you to tell me that you watched the news." Drennon's father then

connected Bankston into the call, and Drennon asked her if she had "made it down there yet." Bankston responded that she had not, but was on her way. She explained that she had not talked to "them" yet, and Drennon responded that he would talk to her "later on."

About an hour later, Drennon called Bankston from jail. During that call, Bankston told Drennon that her "Auntie Monique" killed her husband last night and that "she" did it at Club 112. Drennon responded by saying, "so it's a wrap, huh," and "that's something we ain't got to worry about no more." Drennon also asked, "so they say they sure it's over," to which Bankston replied, "yes." Drennon also asked Bankston, "did you see it on the news"? Drennon's father joined the phone call; Drennon asked him to call Hargrove and explained that he wanted to talk to Hargrove because "I just need to hear something from his mouth, man, that's it." Hargrove eventually joined the call and told Drennon that the "n***** f**ked the s**t out of that ho, man." Drennon asked, "what that ho end like," and Hargrove repeated what he had just said and added that he had told Drennon that he "was going to fix it" and

12

"f\*\*k that ho for you."

Drennon did not testify at trial. His defense centered, in part, around his role as an informant for Detective David Quinn, who was investigating Griffin's murder. At trial, Detective Quinn testified that he first met Drennon as a result of an investigation in February 2007 in which Drennon was a witness. Detective Quinn interviewed Drennon, and Drennon provided accurate information about three unsolved crimes. After that interview, Detective Quinn and Drennon stayed in contact, and Drennon continued to be an informant for Quinn. Detective Quinn testified that Drennon was "probably the greatest source I had ever encountered." In closing arguments, Drennon's counsel argued that the phone calls that Drennon made from jail to Bankston and others were not evidence of his guilt, but were simply him "still working with Detective Quinn, still fishing for information to help Detective Quinn."

2. Drennon contends that, because the trial court did not make specific findings on matters such as the conflicts in the evidence and the credibility of witnesses in denying Drennon's motion for new

13

trial on the general grounds under OCGA §§ 5-5-20 and 5-5-21, the court did not fulfill its role as the "thirteenth juror." For this reason, Drennon contends that we must vacate and remand for the trial court to fulfill its statutory duty. We disagree.

> Even when the evidence is legally sufficient to sustain a conviction, a trial judge may grant a new trial if the verdict of the jury "is contrary to . . . the principles of justice and equity," OCGA § 5-5-20, or if the verdict is "decidedly and strongly against the weight of the evidence." OCGA § 5-5-21. When properly raised in a timely motion, these grounds for a new trial—commonly known as the "general grounds"—require the trial judge to exercise a "broad discretion to sit as a 'thirteenth juror.'" In exercising that discretion, the trial judge must consider some of the things that she cannot when assessing the legal sufficiency of the evidence, including any conflicts in the evidence, the credibility of witnesses, and the weight of the evidence.

*White v. State*, 293 Ga. 523, 524 (753 SE2d 115) (2013) (citation omitted). Moreover, we have held that "[w]hen a trial court exercises its discretion as the 'thirteenth juror, it need not explicitly speak of its discretion with respect to the general grounds," and "unless the record shows otherwise," we even "presume that the trial court understood the nature of its discretion and exercised it."

14

*Hodges v. State*, 309 Ga. 590, 592 (847 SE2d 538) (2020) (citation and punctuation omitted) (rejecting a defendant's contention that the trial court did not properly exercise its discretion as the "thirteenth juror" where "the trial court specifically stated in its order that it was denying [the defendant's] motion for new trial after 'consideration of the pleadings, the transcript of proceedings, and [the] applicable law,'" "did not state [an] incorrect standard in its order, and nothing in the record indicate[ed] that the court was unaware of its responsibility"). See also *Myers v. State*, 313 Ga. 10, 13-14 (867 SE2d 134) (2021) (holding that the record did not support the defendant's "argument that the trial court failed to fulfill its duty in ruling on the general grounds to weigh the evidence and consider the credibility of the witnesses," because in its order denying the motion for new trial, the trial court explained that the defendant "asked the court to reverse his convictions under the discretion given to the court by OCGA §§ 5-5-20 and 5-5-21" and "[t]he court found that 'this is not an exceptional case in which the evidence preponderates heavily against the verdict'").

15

Here, in denying Drennon's motion for new trial on the general grounds, the trial court specifically acknowledged that Drennon was moving "the Court to reverse his convictions under the discretion given to the Court by OCGA §§ 5-5-20 and 5-5-21" and then denied the motion based on the specific finding that "this is not an exceptional case in which the evidence preponderates heavily against the verdict." Thus, the record does not support Drennon's claim that the trial court failed to exercise its discretion under OCGA §§ 5-5-20 and 5-5-21. See *Myers*, 313 Ga. at 13-14.

3. Drennon contends that the evidence is insufficient as a matter of constitutional due process and as a matter of Georgia statutory law, see OCGA § 24-14-6, to support his conviction for the malice murder of Griffin. More specifically, Drennon contends that the evidence showed that he was in jail at the time of Griffin's murder, that Drennon had no part in setting up or encouraging the murder, that his conversations with his IRC associates while in jail demonstrated Drennon's attempts to obtain information to pass along to Detective Quinn, and that the State's evidence was entirely

16

circumstantial and failed to exclude the hypothesis that other members of the IRC independently killed Griffin while carrying out their plan to rob him for his jewelry. We disagree.

When evaluating a challenge to the sufficiency of the evidence as a matter of constitutional due process, we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt for the crimes for which he was convicted. See *Jones v. State*, 304 Ga. 594, 598 (820 SE2d 696) (2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979)). We leave to the trier of fact "the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts," *Smith v. State*, 308 Ga. 81, 84 (839 SE2d 630) (2020), and we do not "reweigh the evidence," *Ivey v. State*, 305 Ga. 156, 159 (824 SE2d 242) (2019) (citation and punctuation omitted).

Moreover, as a matter of Georgia statutory law, "to warrant a conviction on circumstantial evidence, the proved facts shall not only

17

be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. "Not every hypothesis is reasonable, and the evidence does not have to exclude every conceivable inference or hypothesis; it need rule out only those that are reasonable." *Garay v. State*, 314 Ga. 16, 20 (875 SE2d 631) (2022) (citation and punctuation omitted). "Whether alternative hypotheses are reasonable . . . is usually a question for the jury, and this Court will not disturb the jury's finding unless it is insufficient as a matter of law." *Frazier v. State*, 308 Ga. 450, 453 (841 SE2d 692) (2020) (citation and punctuation omitted). Additionally, under Georgia statutory law, "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20 (a). Conviction as a party to a crime requires proof of a common criminal intent, which a trier of fact may infer from "presence, companionship, and conduct before, during and after the offense." *McGruder v. State*, 303 Ga. 588, 591 (814 SE2d 293) (2018) (citation and punctuation omitted).

18

The evidence here regarding Drennon's role in Griffin's murder, although circumstantial, was sufficient to convict Drennon as a matter of constitutional due process. To begin, the State introduced evidence that "IRC members . . . had planned Griffin's murder to retaliate for Drennon's arrest." *Morris*, 294 Ga. at 47. Moreover, viewed in the light most favorable to the verdicts, the jury was entitled to conclude that Drennon was angry that Griffin identified him at the hospital, telling his IRC associates that "some dude came in there and identified me" and that "the n***** tried to identify a n*****." Similarly, the jury was told that Drennon and his IRC associates referred to Griffin as "ol' girl" and could infer that they used other code words such as "ho," "whore," and "girl" to refer to Griffin; that Drennon was worried about or bothered by Griffin, saying that he was "sweatin' that ho"; and that Drennon was asking his IRC associates to kill Griffin and encouraging them to do so, telling Hargrove to "lay that ho out for me." Hargrove promised that he would, saying that Drennon had Hargrove's word that "I'm a f**k the s**t out that ho." In response, Hargrove said that he had told

19

Drennon that he "was going to fix it" and "f**k that ho *for you*," (emphasis supplied), a statement from which the jury could infer Hargrove was acting with Drennon's encouragement. In addition, the jury could infer from Drennon's declarations of impatience—such as "[g]o on ahead and lay that ho on out for me," and "[a]in't s**t going on on the f**king news"—coupled with responses by Hargrove and Stevens to "be cool and just watch the news" and "that news going to come up," that Drennon was encouraging his fellow IRC associates to kill Griffin and that he and they were acting with a common intent. There was also evidence that Bankston used coded language to inform Drennon that Hargrove ("Auntie Monique") had killed her "husband" (Griffin) at Club 112. Finally, Drennon expressed relief when he found out that Griffin had been killed, telling Bankston, "so it's a wrap, huh," and "that's something we ain't got to worry about no more."

Although Drennon contends that he had the conversations from jail to produce information to give to Detective Quinn, it was for the jury, and not this Court, to resolve any conflicts or

20

inconsistencies in the evidence, judge the credibility of witnesses, and draw reasonable inferences from the facts. See *Smith*, 308 Ga. at 84. In addition, "[a] defendant need not pull the trigger, or even be present for a shooting, to be found guilty as a party to murder and related crimes." *Nicholson v. State*, 307 Ga. 466, 473 (837 SE2d 362) (2019) (holding that the evidence was sufficient to sustain the conviction of a gang member where it showed that he intentionally advised and encouraged other "gang members to commit the crimes"). In sum, viewed in the light most favorable to the verdicts, we conclude that the evidence summarized above was sufficient to support Drennon's conviction for malice murder as a matter of constitutional due process. See *Jackson*, 443 U. S. at 319.

Drennon nonetheless argues that there was a reasonable hypothesis other than his guilt—that his fellow IRC members killed Griffin to obtain his jewelry and did so without any encouragement from Drennon—such that the evidence presented at trial was not sufficient to convict him of malice murder as a matter of Georgia statutory law. See OCGA § 24-14-6. However, as we have explained,

21

"[n]ot every hypothesis is reasonable," and evidence "need rule out only those that are." *Garay*, 314 Ga. at 20. Moreover, whether the alternative hypothesis asserted by Drennon is reasonable was a question for the jury, and we will not disturb the jury's finding on this point "unless it is insufficient as a matter of law." *Frazier*, 308 Ga. at 453. Here, based on the evidence summarized above—which includes evidence that Griffin's Breitling jewelry was found on his body after he was killed—we conclude that the jury was free to reject as unreasonable the hypothesis that Drennon spoke with IRC members from jail only to obtain information for Detective Quinn, and not to encourage members of the IRC to kill Griffin, and that the members of the gang acted independently in killing Griffin to steal his jewelry. Accordingly, the evidence was also sufficient to support Drennon's conviction for murder as a matter of Georgia statutory law. See OCGA § 24-14-6.

4. Drennon contends that the evidence is insufficient to support his conviction for participation in criminal street gang activity. We disagree.

22

(a)  Before turning to the merits of Drennon's claim, we note that, as part of proving its case that Drennon was involved in criminal gang activity, the State introduced testimony from several witnesses implicating Drennon and the IRC in "a September 2006 attack on, kidnapping of, and burglary of the home of victim Gary Lester." *Morris*, 294 Ga. at 47.[2]  Easterling and Lester testified that while Lester was playing a video game at Tight Werk, an automobile shop Drennon operated, Drennon hit Lester in the head with a gun. At that point, Drennon, with assistance from other members of the IRC, handcuffed Lester and placed a scarf over his eyes.  They then put Lester in a truck, and Easterling, Stevens, and others (but not

---

[2] Drennon was indicted for these crimes, but they were severed for trial. In this appeal, Drennon does not challenge the State's use of the 2006 crime against Lester to prove the criminal-gang-activity count of the indictment.  See *Morris*, 294 Ga. at 48-49 (holding that the trial court did not abuse its discretion in admitting evidence of crimes for which Edward Morris was indicted, but which were severed for his trial, as relevant to prove the criminal-gang-activity count against Morris).  See also OCGA § 24-4-418 (a), which was enacted in 2016 and which says that "[i]n a criminal proceeding in which the accused is accused of conducting or participating in criminal gang activity in violation of Code Section 16-15-4, evidence of the accused's commission of criminal gang activity, as such term is defined in Code Section 16-15-3, shall be admissible and may be considered for its bearing on any matter to which it is relevant."

23

Drennon) drove Lester to several locations and eventually to his house, which they burglarized. According to Lester, IRC members took "clothes, jewelry, [a] gun, [and a] t.v."

(b) Drennon was charged in the indictment with violating the Street Gang Act by participating in crimes of violence, including murder, armed robbery, criminal attempt to commit armed robbery, aggravated assault, and kidnapping, while associated with the IRC. To prove that Drennon violated the Street Gang Act, the State was required to show that he was, in fact, associated with the IRC, that the IRC was a "criminal street gang," that Drennon committed a predicate act of violence contained in OCGA § 16-15-3 (1) (J) and as set forth in the indictment, and that the act of violence was intended to further the interests of the IRC. See OCGA § 16-5-4 (a); OCGA § 16-15-3 (1) (J); OCGA § 16-15-3 (3); *Boyd v. State*, 306 Ga. 204, 209 (830 SE2d 160) (2019); *Chavers v. State*, 304 Ga. 887, 890 (823 SE2d 283) (2019).

Drennon contends that the State failed to prove three of these elements: that he was associated with the IRC gang, that he

24

participated in a crime of violence, and that he undertook criminal activity to further the interests of the gang. As for whether Drennon was associated with the IRC, Drennon contends that "no one testified that he was a part of this gang." But he overlooks the testimony of Easterling, who testified that Drennon was a member of the IRC. Moreover, Detective Quinn testified that Drennon provided him with accurate information about the activity of members of the IRC, and Drennon elicited testimony that his conversations with Detective Quinn indicated that Drennon was "hanging out with [members of the IRC] on a regular basis" and that "a lot of them are hanging out at Tight Werk," where Drennon worked. Other evidence, including testimony from Lester, Easterling, and Bankston, confirmed that Drennon had frequent contact with members of the IRC and participated in violent crimes with them. Viewed in the light most favorable to the verdicts, the evidence was sufficient to authorize the jury to conclude that Drennon was, at the very least, associated with the IRC. See *Lupoe v. State*, 300 Ga. 233, 237-238 (794 SE2d 67) (2016) (concluding that

evidence such as a defendant's frequent contact with members of a gang was sufficient to show that the defendant was "associated with" the gang).

Drennon summarily argues that the State failed to prove that he committed a predicate act of violence, but we readily conclude that when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to show that Drennon participated in crimes of violence against Griffin on June 10, against Griffin and Magee on May 22, and against Lester in 2006. See OCGA § 16-15-3 (1) (J). Finally, Drennon argues that there was a complete lack of evidence that he had the intent to further the interests of the IRC because, according to Drennon, mere association with a criminal street gang is insufficient to satisfy this element and the State did not show that he participated in any of the IRC activities. We disagree. We have held that "[e]vidence of [a defendant's] association with [a gang] and his participation in the group's activities before and during the crimes charged provide the required nexus between his criminal acts and the intent to further

26

the gang's interests." *Hayes v. State*, 298 Ga. 339, 342-343 (781 SE2d 777) (2016). See also *Rodriguez v. State*, 284 Ga. 803, 807 (671 SE2d 497) (2009) ("Management of or participation with others in . . . criminal street gang activity necessarily implies knowledge of the gang's criminal activities and a specific intent to further its criminal purposes."). To that end, Easterling testified that the IRC's goal in committing its criminal acts was to collect "money, drugs, jewelry, guns[, and] merchandise," and the jury was authorized to conclude that Drennon's activities, including the attempted robbery of Griffin on May 10 and the kidnapping and robbery involving Lester, furthered that goal. Moreover, there was evidence that "IRC members . . . had planned Griffin's murder to retaliate for Drennon's arrest," *Morris*, 294 Ga. at 47, and Drennon's encouragement of IRC members to kill Griffin furthered that goal. For these reasons, we conclude that the evidence is constitutionally sufficient to support Drennon's conviction for criminal street gang activity.

5. For the first time in this case, Drennon contends that he was denied his right to be present numerous times when he was excluded

from bench conferences during jury selection. As explained below, this claim should be addressed in the first instance by the trial court on remand.

"This Court has long held that the Georgia Constitution guarantees criminal defendants the right to be present, and see and hear, all the proceedings which are had against him on his trial before the court." *Champ*, 310 Ga. at 839 (citation and punctuation omitted). Moreover, a defendant's right to be present

> may be violated when a defendant is excluded from conferences held at the bench between the trial court and the lawyers for the parties, because while the defendant may be present in open court and thus able to see such bench conferences, he presumably cannot hear what is discussed (as preventing jurors and others in the courtroom from hearing such conferences is their very purpose).

Id. It is well settled that "[j]ury selection is a critical stage at which a defendant generally is entitled to be present, including at bench conferences." *Young v. State*, 312 Ga. 71, 79 (860 SE2d 746) (2021). "[W]e have repeatedly held that a defendant has the right to participate in a bench conference during which a prospective juror

28

or a trial juror is discussed and removed." *Champ*, 310 Ga. at 840.

However,

> [m]ost bench conferences involve questions of law and consist of essentially legal argument about which the defendant presumably has no knowledge, and many other bench conferences involve logistical and procedural matters. A defendant's presence at bench conferences dealing with such topics bears no relation, reasonably substantial, to the fullness of his opportunity to defend against the charge, and the constitutional right to be present does not extend to situations where the defendant's "presence would be useless, or the benefit but a shadow." Thus, a defendant's right to be present is not violated by his absence from such bench conferences.

*Heywood v. State*, 292 Ga. 771, 774 (743 SE2d 12) (2013) (cleaned up). Moreover, a defendant may relinquish his right to be present "if he so chooses." *Champ*, 310 Ga. at 841 (citation and punctuation omitted).

> A defendant may relinquish his right in several ways: if he personally waives the right in court; if his counsel waives the right at his express direction; if his counsel waives the right in open court while he is present; or, as seen most commonly in our case law, if his counsel waives the right and the defendant subsequently acquiesces to that waiver.

Id. [3] "Acquiescence may occur when a defendant remains silent after he becomes aware of the proceedings occurring in his absence, so long as he had sufficient information concerning the matters occurring outside his presence for his silence to be fairly construed as consent." Id.

However, where a defendant

> raises a right-to-be-present claim for the first time on appeal, unless that claim can be easily rejected based on the existing record, the case should be remanded to the trial court for a hearing at which the parties have an opportunity to supplement the record with relevant evidence and after which the trial court may make factual findings and issue an order ruling on the claim, which may then be reviewed in a subsequent appeal.

*Champ*, 310 Ga. at 844.[4] We adopted this rule, in large part, because

---

[3] The Attorney General, but not the District Attorney, argues that Drennon's right-to-be-present claim is not preserved for review because Drennon did not raise it until this appeal. But the right to be present "is a personal right of the defendant that cannot be waived merely by the failure of his counsel to timely assert it; it must be relinquished by the defendant himself" in one of the ways discussed above. *Champ*, 310 Ga. at 841 n.7.

[4] We have explained that "'mere speculation as to what may have been discussed at [a bench] conference cannot serve as the basis for the grant of a new trial,'" *Reed v. State*, Case No. S22A0530, 2022 WL 4085942, at *8 (Ga. Sept. 7, 2022) (quoting *Nesby v. State*, 310 Ga. 757, 759 (853 SE2d 631) (2021)), and have held that where a defendant "offers nothing more than speculation

30

right-to-be-present claims often involve "fact-specific" decisions that "[t]rial judges are generally better situated than appellate courts to make." Id. See also *Reed v. State*, Case No. S22A0530, 2022 WL 4085942, at *5 (Ga. Sept. 7, 2022) (explaining the efforts of counsel and the trial court to recreate a record during motion for new trial proceedings of what occurred at bench conferences that were not transcribed in order to determine whether Reed was denied his right to be present at those conferences and if so, whether he acquiesced to the denial of that right).

We note that our ability to evaluate Drennon's claim is hampered by the minimal argument offered in his appellate brief. To that end, Drennon provides a list of citations to pages of the voir dire transcript where bench conferences occurred, but makes no

---

as to what the conferences might have concerned," his claim that his right to be present was violated fails, *Reeves v. State*, 309 Ga. 645, 648 (847 SE2d 551) (2020) (citation and punctuation omitted). Accord *Nesby*, 310 Ga. at 759. However, *Reed*, *Nesby*, and *Reeves* were all cases in which the defendant had an opportunity to develop a record on his right-to-be-present claim on motion for new trial, see *Reed*, 2022 WL 4085942, at *5-*6; *Nesby*, 310 Ga. at 759; *Reeves*, 309 Ga. at 648, and it is appropriate under those circumstances to apply the "mere speculation" principle to the defendant's right-to-be-present claim. Here, by contrast, the defendant has had no such opportunity to develop the record on whether he was denied his right to be present.

effort to explain or contextualize any of the individual bench conferences. Nor does he analyze, with supporting citations of authority, how his right to be present was denied. Instead, he simply claims that "it is impossible to tell" whether the conferences he points to were about jury selection—the type of bench conference for which Drennon generally would have the right to be present—as opposed to about practical or logistical issues—the type of bench conference for which Drennon generally would not have such a right—and summarily concludes that his right to be present was violated.[5]

After a careful review of the record, we conclude that Drennon's right-to-be-present claim cannot be "easily rejected based on the existing record." Id. This Court simply does not have enough

---

[5] We conclude that Drennon's appellate brief on this issue complies with this Court's Rule 22 (explaining that "[a]ny enumerated error not supported by argument or citation of authority in the brief shall be deemed abandoned"), but only marginally so. We also note that Drennon's current counsel on appeal represented him during the motion for new trial proceedings, and despite the fact that current counsel called trial counsel as a witness during those proceedings, current counsel made no apparent effort to develop a record regarding Drennon's right-to-be-present claim. We encourage counsel contemplating right-to-be-present claims on behalf of a client to develop the record on such claims as early as possible under the circumstances.

information to "easily reject" his claim—but neither do we have enough information to determine whether Drennon's right to be present was violated or whether Drennon relinquished any right that he had to be present. See *Champ*, 310 Ga. at 841. In conducting our analysis, we considered that all nine bench conferences to which Drennon points occurred during jury selection, a part of the trial "at which a defendant generally is entitled to be present, including at bench conferences." *Young*, 312 Ga. at 79. But those conferences were not transcribed; the transcript only notes that "a discussion was had at the bench between the court and counsel." Moreover, we cannot discern from the transcript notations that the conferences were between "court and counsel" whether Drennon was necessarily excluded from those conferences. However, to guide the trial court on remand, and to highlight to practitioners the difficulty this Court faces when an appellant does not develop the factual record for a right-to-be-present claim before he makes such a claim on appeal, we review the circumstances related to two of the nine bench

conferences at issue to explain why a remand is necessary.[6]

(a) Before one of the bench conferences occurred, the trial court informed the prospective jurors that it would hear from them about any hardships that they had. The trial court then took down the numbers of the jurors who indicated that they wanted to be heard regarding a hardship. A short time later, the court excused all jurors, except those who indicated a desire to be heard regarding

---

[6] We also note that to ensure that a defendant's right to be present is not violated, trial judges could altogether decline to hold bench conferences and instead could conduct such conferences in open court outside the presence of the jury; could require bench conferences to be transcribed; or, when bench conferences are held without participation from criminal defendants, could inform those defendants, where applicable, of their right to be present and inquire as to whether they wish to exercise or waive that right, making a record of any waiver of rights. Similarly, the trial court, prosecutor, and defense counsel should undertake to protect a defendant's right to be present, taking care to make a contemporaneous record of what transpired before and during bench conferences. See *Sammons v. State*, 279 Ga. 386, 388 n.12 (612 SE2d 785) (2005) (reversing a defendant's conviction because he denied his right to be present at a critical stage of his trial and reminding "[p]rosecutors . . . that they share the duty to ensure a fair trial" and encouraging them, "if proceedings take place outside the presence of the defendant," to "alert the trial court of the need to allow the defendant time to discuss the issue with counsel and to permit [the] defendant to place an express waiver on the record"). See also *Champ*, 310 Ga. at 849 (McMillian, J., concurring) (encouraging trial courts and counsel "to put on the record what occurred at bench conferences or confirm that the defendant waived the right to be present"). Efforts such as these could ease or prevent the difficult task of recreating on appeal what occurred at bench conferences held months or years earlier.

their hardship. The jurors who remained to discuss their hardships included Jurors 1, 6, 7, 10, 11, 13, 14, 18, 22, 23, 24, 27, 28, 29, 30, 31, 34, 35, 36, 37, 38, 39, 43, 45, 47, and 50. After the other jurors were excused, Drennon's counsel asked the trial court if counsel could approach the bench. The record indicates that "a discussion was had at the bench between the court and counsel," with no indication of what the discussion was about. Immediately after the conference, the trial court began to hear from the jurors who remained because of their potential hardships, turning first to Juror 1, who expressed concern about a financial hardship due to self-employment.

Drennon offers no specific argument about this bench conference. The State contends that trial counsel approached to discuss whether the court should question Juror 1 about a potential conflict due to self-employment. However, shortly before the bench conference, the trial court had already said that it was planning on questioning all the jurors who indicated that they had potential hardships, and immediately before it, the court asked all those

jurors to remain in the courtroom. The record therefore leaves us unable to easily conclude that this conference concerned a matter for which Drennon did not have a right to be present. If Drennon did have a right to be present, the transcript, as noted above, does not indicate whether he was present and, likewise, does not indicate whether he could hear what was being discussed. Moreover, as was the case in *Champ*, "[t]here is no indication in the record" here that Drennon "personally waived his right to be present for th[is] bench conference[] or that his counsel waived that right in [Drennon's] presence or with his express authority." 310 Ga. at 841. In addition, the record is unclear on the "highly fact-specific question" of acquiescence. Id. We cannot determine, for example, whether other discussions on the record during trial may have given Drennon "sufficient information concerning the matters occurring outside his presence for his silence to be fairly construed as consent." Id. Nor do we have any indication that Drennon knew about the conference despite being absent from it based on discussions that occurred off the record, such as by defense counsel informing him of what

36

occurred at the conference. See *Champ*, 310 Ga. at 843 (explaining that "defendants often may know more about the subject of proceedings in which they do not participate than is apparent from a trial transcript). For these reasons, this right-to-be-present claim cannot be "easily rejected based on the existing record." *Champ*, 310 Ga. at 844.

(b)  Another bench conference occurred after the trial court announced in open court that a prospective juror had emailed the court. The record is silent as to the subject matter of that email and as to what the court and counsel discussed at the bench conference. The record therefore leaves us unable to easily conclude that this conference concerned a matter for which Drennon did not have a right to be present. If Drennon did have a right to be present, the transcript does not indicate whether he was present or whether he could hear what was discussed at the conference. Moreover, again, "[t]here is no indication in the record" here that Drennon "personally waived his right to be present for th[is] bench conference[] or that his counsel waived that right in [Drennon's] presence or with his

37

express authority." *Champ*, 310 Ga. at 841. In addition, all of the reasons that we gave for not being able to easily reject Drennon's right-to-be-present claim with regard to the bench conference discussed above on the ground of acquiescence apply equally to this bench conference. Accordingly, this right-to-be-present claim cannot be "easily rejected based on the existing record." Id. at 844.

(c) These two bench conferences are only two of the nine bench conferences Drennon cites in his appellate brief, but they are illustrative of why we do not have enough information to "easily reject" Drennon's claim and why it is therefore necessary to remand for the trial court to develop a factual record and decide, with respect to all nine bench conferences, whether Drennon had a right to be present at the conferences and if so, whether Drennon personally waived his right to be present at the conferences or acquiesced to his absence from them.

For these reasons, we affirm the sufficiency of the evidence supporting Drennon's convictions and conclude that the trial court did not fail to exercise its discretion as the "thirteenth juror" when

ruling on the general grounds of Drennon's motion for new trial, but vacate the trial court's judgment in part and remand the case to that court to hold a hearing on Drennon's right-to-be-present claim. If the trial court rules against Drennon's claim, he will have 30 days to file a new notice of appeal of the decision and may appeal that decision and any other enumeration of error not addressed in this opinion.[7]

*Judgment affirmed in part and vacated in part, and case remanded with direction. All the Justices concur.*

---

[7] Likewise, if the trial court grants Drennon a new trial based on his right-to-be-present claim, the State may appeal that decision. See OCGA § 5-7-1 (a) (8) (providing that the State may appeal "[f]rom an order, decision, or judgment of a court granting a motion for new trial or an extraordinary motion for new trial").