NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 6, 2023

S23A0454.  SCOTT v. THE STATE.

PINSON, Justice.

Appellant Diontye Scott was convicted of malice murder and other crimes in connection with the shooting death of Antonio Veal.[1]

---

[1] The crimes occurred on October 3, 2017. On January 5, 2018, a Fulton County grand jury indicted Scott for malice murder (Count 1), three counts of felony murder (Counts 2, 3, and 4), two counts of aggravated assault with a deadly weapon (Counts 5 and 6), two counts of possession of a firearm during the commission of a felony (Counts 7 and 11), four counts of possession of a firearm by a convicted felon (Counts 12, 13, 14, and 15), possession of marijuana with the intent to distribute (Count 8), speeding (Count 9), and driving with a suspended license (Count 10). Counts 8, 11, and 15 were dismissed prior to trial. Scott's girlfriend, Dedryna Thornton, was also indicted for tampering with the evidence. Scott was tried separately by a jury from August 20 to 21, 2019. The jury found Scott guilty of all counts. Scott was sentenced to serve life in prison without the possibility of parole on Count 1, 20 years on Count 6 to run consecutive to Count 1, 12 months on Count 9 to run concurrent to Count 1 and commuted to time served, 12 months on Count 10 to run concurrent to Count 1 and commuted to time served, and 15 years on Count 13 to run consecutive to Count 6. The remaining counts were merged or vacated by operation of law. Scott filed a motion for new trial, which he amended through new counsel on September 2, 2021. Following a hearing, the court denied the motion for new trial on July 16, 2022. Scott filed a timely notice of appeal. The case was docketed to the term of this court beginning in April 2023 and submitted for a decision on the briefs.

On appeal, Scott contends that his trial counsel provided ineffective assistance by failing to (1) request an instruction limiting the jury's consideration of the stipulations to Scott's prior felony convictions as proof of his status as a convicted felon; (2) request an instruction limiting the jury's consideration of Scott's prior felony convictions to only impeachment; and (3) object to the State's closing argument, which allegedly misstated the burden of proof. He also argues that (4) these errors, taken together, deprived him of a fair trial, see *Schofield v. Holsey*, 281 Ga. 809, 811 (II) n.1 (642 SE2d 56) (2007), overruled on other grounds by *State v. Lane*, 308 Ga. 10, 23 (4) (838 SE2d 808) (2020). But Scott's ineffective-assistance claims have no merit. Trial counsel did not act unreasonably by not requesting a limiting instruction regarding Scott's prior convictions proving his convicted-felon status and not requesting an instruction to limit consideration of his prior convictions for impeachment purposes, so his counsel's performance was not deficient. And Scott was not prejudiced by his counsel's failure to object to the State's closing argument. Even assuming that his counsel erred by failing to object

2

to the State's closing argument, Scott failed to show more than one error, so we need not assess any cumulative prejudice. So we affirm his convictions.

1. On October 3, 2017, Scott shot and killed Veal in the second floor breezeway of the Garden Inn motel, then shot and injured Veal's girlfriend, Caitlin Payne. The evidence at trial showed the following.

Shashirekha Shetty owned and ran the Garden Inn motel, which served both short-term and long-term guests. As of September 2017, Scott and his girlfriend, Dedryna Thornton, had been staying at the Garden Inn for about three to four months.[2] Scott testified that the Garden Inn "was like New Jack City,"[3] and he "started selling beer, liquor, weed" from their room, claiming, "I literally[] ran this hotel." Thornton also sold food from their room. Shetty

---

[2] Scott testified that they had been staying at the Garden Inn for seven or eight months, while Shetty and Thornton testified that the stay was three or four months.

[3] New Jack City is a 1991 movie "about a rising drug lord in New York City during the crack cocaine epidemic." *Johnson v. State*, 355 Ga. App. 683, 683 n.3 (845 SE2d 419) (2020).

increased their room rates because she wanted them to leave due to the heavy traffic in and out of the room. Veal and Payne also lived at the Garden Inn as of September 2017. Scott and Thornton knew Veal and Payne.

On September 26, three unknown men entered Scott and Thornton's room, robbed them, and shot Thornton in the leg. After the shooting, Shetty told Scott and Thornton to move out, and they did. Three or four days later, Scott and Thornton came by the motel to watch the surveillance videos of the shooting. After watching the videos, Scott testified, he "knew who it was." He told law enforcement at the time that Veal was one of the three men; at trial, he testified that he lied when he gave that statement, and that Veal was not one of the three men. The surveillance video of the robbery and a surveillance video of Scott and Thornton watching the video of the robbery were played for the jury.

At some point after moving out of the Garden Inn, Thornton asked Shetty if she could stay at the motel for a few days, and Shetty agreed. Thornton and Scott returned to the motel on October 3 and

checked into room 310, which Thornton requested and which was close to Veal's original room. Veal and Payne originally stayed in room 308, but moved to a nicer room, room 202, on October 3 to celebrate Payne's birthday.

That evening, Scott saw Veal on the second floor breezeway and went over to talk to him. The confrontation was captured on surveillance videos and played for the jury. Several minutes into the confrontation, Payne opened her room door and stood in the doorframe listening and smoking a cigarette. Thornton saw Scott and Veal speaking and went to the breezeway. Thornton testified that Scott asked, "You sent them men on me?" and Veal responded, "I would never hurt sis," referring to Thornton. Thornton testified that she tried to get Scott to leave "because I didn't want him to do anything crazy," and she saw that he had a gun in his hand. Payne testified that Veal said "on his kids, he didn't do it."

A few minutes later, Payne tried to move toward Veal. The surveillance video showed that Payne squeezed in between Scott and Veal to hand something to Veal. Payne testified that she handed

Veal a lighter. When Payne retreated, Veal was leaning back against the railing of the breezeway, and briefly put his hands up, with his palms open. The conversation between Veal and Scott continued for another minute and a half. Scott then pulled out his gun and shot Veal in the chest. Payne ran to where Veal collapsed, and Scott turned and shot Payne in the back.

Scott testified that he confronted Veal to ask for an apology for the September 26 robbery and shooting. He asked Veal why Veal robbed him, and Veal said, "I ain't got nothing to do with that." Scott then confronted Veal with a text message a friend had shown him, which had led Scott to believe that Veal orchestrated the robbery and shooting of Thornton. Scott testified that when he told Veal about the text message, Veal "froze," and that Thornton was "in a rage" and "cussing [Veal] out."[4] Veal then turned his back on Scott,

---

[4] While the surveillance videos do not have audio, one video of the confrontation shows Thornton standing close to Veal and saying something while gesticulating with her hands. But Thornton testified that she was just trying to get Scott to leave and that she did not "ha[ve] a choice word" with Veal. Thornton testified on behalf of the State as part of an immunity deal whereby the State would not use her testimony at Scott's trial against her during her own trial for tampering with the evidence related to the shootings.

which Scott believed was "really, really, really disrespectful." When Payne went to approach Veal, Scott testified that he asked her to stop three times, but she walked past him and handed something to Veal, which Scott said "put [him] in defense mode." Scott testified that he believed a gun could have been concealed in Payne's closed hand (although he did not actually see a gun). He said that he shot Payne because "I knew what she's capable of. This ain't no—this is no ordinary female. These people rob people together."

After the shooting, Scott and Thornton went to Scott's car and drove away from the motel. While traveling on the highway, a College Park police officer detected that Scott was driving 93 miles per hour in a 65 mile-per-hour zone. While the officer was trying to pull over Scott's vehicle, the vehicle slowed down and objects, including small baggies with "a very strong odor of marijuana" and a black gun, were thrown out of the windows. Once the vehicle was pulled over, the officer ran a search of Scott's driver's license and found that it was suspended. The next day, officers searched the highway and found a black gun and several 9mm bullets. The gun

was determined to be the same gun that fired the 9mm bullets found at the crime scene.

2. Scott contends that his trial counsel provided constitutionally ineffective assistance. To establish ineffective assistance of counsel, a defendant must show that his counsel's performance was professionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove deficiency, he must show that his lawyer "performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms," which is "no easy showing, as the law recognizes a strong presumption that counsel performed reasonably." *Davis v. State*, 299 Ga. 180, 182-183 (2) (787 SE2d 221) (2016) (citation and punctuation omitted). To show prejudice, a defendant must show "that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." *Washington v. State*, 313 Ga. 771, 773 (3) (873 SE2d 2022). "A reasonable probability is a probability sufficient to

undermine confidence in the outcome." *Strickland*, 466 U.S. at 694 (III) (B). If a defendant fails to make a sufficient showing on one part of the *Strickland* test, we need not address the other part. See *Washington*, 313 Ga. at 773 (3).

(a) Scott first contends that his counsel should have requested an instruction allowing the jury to consider his stipulations to prior convictions only for the limited purpose of proving his status as a convicted felon.

Before trial, the State and defense counsel agreed to stipulate to Scott's prior felony convictions for purposes of proving Scott's convicted-felon status for the felon-in-possession counts. The stipulations were read to the jury at the close of the State's case and given to the jury in an exhibit. They read:

> 1) To meet its burden in Counts 12 and 14 of this indictment, the State must prove beyond a reasonable doubt that the Defendant was previously convicted of a felony. The Defendant has stipulated to this fact and no further proof is necessary by the State solely as to that element of those counts.
>
> 2) To meet its burden in Count 13 of this indictment, the State must prove beyond a reasonable doubt that the

9

Defendant was previously convicted of a felony involving the possession of a firearm. The Defendant has (also) stipulated to this fact and no further proof is necessary by the State solely as to that element of that count.

During the jury charge, the court instructed the jury:

The parties have entered into a stipulation that has been approved by the court and made a part of the record as State's exhibit 49. When parties stipulate facts, this is in the nature of evidence. You must take that fact or those facts as a given without the necessity of further proof.

Scott contends that because there was no limiting instruction, the jury likely considered his prior felony convictions when determining his guilt as to all counts. In his view, it was therefore unreasonable for trial counsel not to request a limiting instruction.

Trial counsel did not act unreasonably in declining to seek such an instruction. "The decision of criminal defense counsel not to request limiting instructions is presumed to be strategic." *Jones v. State*, 280 Ga. 205, 207 (2) (b) (625 SE2d 1) (2005). While defense counsel testified at the motion-for-new-trial hearing that he did not have a strategic reason for failing to request an instruction, "[i]f a reasonable lawyer might have done what the actual lawyer did—

10

whether for the same reasons given by the actual lawyer or different reasons entirely—the actual lawyer cannot be said to have performed in an objectively unreasonable way." *Shaw v. State*, 292 Ga. 871, 875 (3) (a) n.7 (742 SE2d 707) (2013). Here, the stipulations read to the jury did not obviously call for a limiting instruction: they contained language that communicated the stipulations applied to the felon-in-possession counts, and they did not refer to any other counts. Further, a limiting instruction could have drawn more attention to Scott's prior convictions and underscored for the jury that he had a criminal record. So not asking for a limiting instruction was not objectively unreasonable, and counsel was not deficient for failing to request one. See *Phillips v. State*, 285 Ga. 213, 220 (5) (c) (675 SE2d 1) (2009) ("Where trial counsel testifies that he chose not to seek a limiting instruction because he did not wish to

draw attention to the prior convictions, the omission was trial strategy and not evidence of ineffective assistance of counsel.").

(b) Scott also contends that his counsel should have requested an instruction allowing the jury to consider his prior convictions only for impeachment purposes.

Although the parties had stipulated to Scott's status as a convicted felon, the jury ultimately heard the statutory names and case numbers of some of his past convictions during the cross-examination of Scott. While cross-examining Scott, the prosecutor asked questions about the robbery of his room and his response to it. Scott denied that cocaine or crack were in his room when he was robbed, and he agreed that he was trying to "paint" Veal as the "bad guy" and that he had said he knew what Veal and Payne were "capable of." This brief colloquy followed:

> [PROSECUTOR]: But isn't it true that you've been convicted of trafficking in cocaine in case number 09SC86853?
> [SCOTT]: Yes, ma'am.
> . . .
> [PROSECUTOR]: And isn't it also true that you've been convicted of aggravated assault with a deadly weapon,

12

false imprisonment, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon?

[SCOTT]: Yes, ma'am.

Scott's certified convictions, which were referenced in the colloquy, were then admitted as exhibits; the court required the convictions to be redacted and did not allow the State to ask questions about the circumstances of the convictions. There was no further argument, discussion, or questioning about the convictions. Scott contends that without a limiting instruction, the jury likely used the prior convictions as substantive evidence or evidence of his general character and propensity.

Scott has failed to establish that trial counsel rendered deficient performance by failing to request an instruction limiting the jury's consideration of his prior convictions to impeachment. Counsel testified at the motion-for-new-trial hearing that Scott's "prior convictions at the time to me were not paramount as far as him telling his story and explaining why he did what he thought he had to do." And, since requesting a limiting instruction might have

drawn further jury attention to Scott's prior convictions, see *Phillips*, 285 Ga. at 220 (5) (c), counsel's choice to not request such an instruction could have been objectively reasonable and strategic, even though counsel did not testify to actually relying on a strategic reason for not making the request, see *Shaw*, 292 Ga. at 875 (3) (a) n.7; *Mohamud v. State*, 297 Ga. 532, 533-534 (2) (a) (773 SE2d 755) (2015) (explaining that, since "hindsight has no place in an assessment of the performance of trial counsel," counsel's trial decision may still have been reasonable even though he testified that, in hindsight, he had no strategic reason for that decision (citation and punctuation omitted)). This is particularly true when, as here, the jury does not hear any details about the convictions other than the statutory names and case numbers. Cf. *Jimmerson v. State*, 289 Ga. 364, 368 (2) (c) (711 SE2d 660) (2011) (holding that trial counsel's decision not to poll the jury or request a cautionary instruction regarding the trial court's statement alluding to the defendant's involvement in recent courthouse shootings "constituted reasonable trial strategy and does not evidence deficient

14

performance" because counsel "would not have wanted to draw extra attention to the issue"). Given the limited nature of the prosecutor's inquiry into Scott's criminal history and the risk that a limiting instruction could draw undue attention to that history, it was not objectively unreasonable for trial counsel not to request a limiting instruction.

(c) Scott further contends that his counsel should have objected to the State's closing argument about the burden of proof. During the State's closing argument, the prosecutor spoke at some length about the State's burden to prove Scott's guilt beyond a reasonable doubt. The prosecutor said, "The law also says that it's not to a mathematical certainty. It's not that you have to say, well I'm about 90 percent sure. Is that good enough? No. That's not what the law requires." Later, the prosecutor explained that the presumption of innocence is "only there until you all believe that it has been over come [sic] by the evidence. And that's something that's personal to you. So if it was during the first further-away surveillance video with Ms. Shetty, then that's sufficient. If you think that's sufficient,

then that's sufficient." Finally, the prosecutor explained, "and once you believe that the defendant did it, it's gone. Once you believe that the defendant is guilty, then that is guilt beyond a reasonable doubt. I'll repeat that again. Once you believe that the defendant is guilty, that is guilt beyond a reasonable doubt."

Scott argues that these statements from the State explained the burden of proof in a way that suggested that the jury should vote to convict him if they personally considered him to be guilty, which effectively reduced the State's burden of proof. In support, he relies on *Debelbot v. State*, 308 Ga. 165 (839 SE2d 513) (2020), in which we held that defense counsel was ineffective for failing to object to a prosecutor's "obviously wrong" description of reasonable doubt during closing argument.

Even assuming that trial counsel performed deficiently by failing to object to the prosecutor's statements about reasonable doubt, Scott has not established prejudice. As we have explained in decisions after *Debelbot*, that case involved a specific set of circumstances that made the prosecutor's comments about

16

reasonable doubt "uniquely" prejudicial, *Debelbot*, 308 Ga. at 168: It was already a "close question" whether the "underwhelming" and "almost entirely circumstantial" evidence was legally sufficient, id. That evidence was unusual in that it showed that the two defendants had "essentially equal opportunities—and no one else had any opportunity at all—to inflict" the fatal injuries, so "the logical probability that either [defendant] inflicted the fatal trauma would be 50 percent." Id. at 169. And, given that peculiarity, the prosecutor's suggestion that the jury could convict a defendant even if it was less than 51 percent sure about the defendants' guilt was "uniquely harmful," id. at 168-169. Finally, the trial court's instruction in *Debelbot* that the State is not required to prove its case to "a mathematical certainty," a phrase which the State repeated twice, "may well have been understood by the jury not as correcting the State's error, but as reinforcing it." *Debelbot v. State*, 305 Ga. 534, 543-544 (2) (826 SE2d 129) (2019).

Absent those unique circumstances, defendants seeking to establish prejudice from a prosecutor's comments that do not

17

accurately characterize reasonable doubt cannot simply rest on *Debelbot*. See *Warren v. State*, 314 Ga. 598, 602-603 (2) (a) (878 SE2d 438) (2022) (in rejecting ineffective-assistance claim based on closing-argument comments about reasonable doubt, contrasting those comments and strong evidence of guilt with "uniquely harmful" remarks and "underwhelming" evidence in *Debelbot*); *Draughn v. State*, 311 Ga. 378, 383 (2) (b) (858 SE2d 8) (2021) (similar). Instead, a defendant asserting an ineffective-assistance claim like the one here must show how a prosecutor's particular mischaracterization of reasonable doubt likely affected how a jury weighed the evidence of his guilt under the circumstances of his case (and in doing so, show how objecting to the comments would have created a reasonable probability of a different outcome).

Scott has not done that here. The prosecutor's comments here were certainly "inadvisable," *Draughn*, 311 Ga. at 383 (2) (b) n.5, and not an accurate characterization of reasonable doubt. Cf. *Debelbot*, 308 Ga. at 169 n.9 ("We admonish lawyers not to confuse jurors by attempting to quantify a standard of proof that is not

18

susceptible of quantification."). But unlike in *Debelbot*, Scott offers no basis in particular evidence to think that the prosecutor's comments would have affected the outcome of his trial, and as we explained above, the evidence of Scott's guilt was strong. Nor was the jury likely to follow the prosecutor's guidance on this issue: the prosecutor told the jury several times that her arguments were not instructions on the law and that the trial court would instruct the jury on the law, and the trial court in fact instructed the jury "accurately and at length" on the burden of proof, the presumption of innocence, and reasonable doubt. In short, as in our other recent cases where a defendant has advanced a *Debelbot*-based theory of prejudice, "any error in the State's characterization of reasonable doubt was considerably less blatant than the error in *Debelbot* and — unlike in *Debelbot* — was cured by the trial court's instructions to the jury." *Draughn*, 311 Ga. at 383 (2) (b). See *Warren*, 314 Ga. at 603 (2) (a).

3. Scott contends that, taken together, the effects of his counsel's errors resulted in cumulative prejudice that deprived Scott

19

of a fair trial.[5] Because we have assumed deficiency in only one instance and Scott has failed to establish any other instance of deficiency, we need not assess cumulative prejudice. See *Scott v. State*, 309 Ga. 764, 771 (3) (d) (848 SE2d 448) (2020) ("Assessing cumulative prejudice is necessary only when multiple errors have been shown . . . ."). So his claims of ineffective assistance fail.

*Judgment affirmed. All the Justices concur.*

---

[5] Scott relies on *Lane*, 308 Ga. 10, but *Lane* "announced a new rule regarding the cumulative effect of a combination of certain *trial court errors* and deficiencies of counsel." *Woods v. State*, 312 Ga. 405, 410 (III) (1) n.7 (862 SE2d 526) (2021) (emphasis in original). Scott alleges errors only by his trial counsel, and not by the trial court. Still, assessing "the cumulative effect of multiple deficiencies on the part of his trial counsel . . . has long been part of the *Strickland* analysis" that governs claims of ineffective assistance of counsel. Id. See *Schofield*, 281 Ga. at 811 (II) n.1.