318 Ga. 199
FINAL COPY

S23A0864. RASHAD v. THE STATE.

MCMILLIAN, Justice.

Appellant Hassan Shareef Rashad was convicted of the malice

murder of two-year-old Adrian Mitchell, Jr., and other crimes.[1]

[1] On June 29, 2018, Rashad was indicted for the malice murder of Adrian (Count 1); felony murder of Adrian predicated on cruelty to children in the first degree, aggravated assault, and aggravated battery (Count 2); murder of Adrian in the second degree (Count 3); aggravated assault upon Adrian (Count 4); aggravated battery upon Adrian (Count 5); cruelty to children in the first degree against Adrian (Count 6); three counts of cruelty to children in the second degree against Adrian (Counts 7, 8, and 9); cruelty to children in the third degree against Adrian's sister L. D. (Count 10); and driving with a suspended and revoked license (Count 11). Sydney Dean, Adrian's mother, was indicted with Rashad on Counts 3, 8, and 9. Sydney entered a guilty plea to Count 3 and testified against Rashad at trial, while Counts 8 and 9 against her were nolle prossed. Counts 3, 7-9, and 11 against Rashad were also nolle prossed.

On November 16, 2021, Rashad was tried and found guilty on all remaining counts—Counts 1, 2, 4-6, and 10. On December 2, 2021, he was sentenced to life in prison without the possibility of parole for malice murder (Count 1) and 12 months in prison for cruelty to children in the third degree (Count 10), to be served concurrently. The felony murder count (Count 2) was vacated by operation of law, and Counts 4, 5, and 6 merged into Count 1. On December 2, 2021, Rashad filed a motion for new trial, which he amended via new counsel on January 11 and February 13, 2023. After a hearing held on February 14, 2023, the trial court entered an order, dated March 20, 2023, denying Rashad's amended motion for new trial. After Rashad filed a notice of appeal on March 23, 2023, this case was docketed to the August 2023 term of this Court and submitted for a decision on the briefs.

Rashad now appeals, contending that the evidence was insufficient to sustain his convictions and that his trial counsel provided constitutionally ineffective assistance. For the reasons that follow, his claims fail, and so we affirm.

1. Viewed in the light most favorable to the jury's verdict, the evidence at trial showed the following.

In the summer of 2017, Rashad entered into a romantic relationship with Sydney Dean, who had two children from past relationships, Adrian and L. D. The couple began living together in September 2017, and after about a month, their relationship started to deteriorate: Rashad verbally abused Sydney and began isolating her from her family, starting with her father. Still, Rashad and Sydney continued living together.

Throughout Sydney and Rashad's relationship, witnesses observed concerning details related to Adrian and Rashad. Sydney's neighbor noticed bruises and dark marks on Adrian after Rashad moved in. In separate instances, that neighbor and Sydney's father, Daryl Dean, each saw Adrian shaking when he was with Rashad.

2

Adrian's sister L. D., who was eight years old at trial, testified that Rashad would "hang [Adrian] upside down and then start whooping [sic] him" even if he had not done anything wrong. And as Sydney recounted, once in September 2017 after returning home, where Rashad was with Adrian at the time, she found a broken wooden back scratcher and saw a "mark" on Adrian's chest. When she asked Rashad what happened, Rashad replied that Adrian had broken the back scratcher by banging it on the floor. As for the mark on Adrian's chest, he said Adrian was clumsy.

(a)    *The October 2017 Leg Injury*

On October 8, 2017, Adrian was taken to the hospital, where doctors concluded that his leg was fractured. The day prior, Adrian had been playing and running around at home, as Daryl, who had been with Adrian alone that day for a period of time, testified and captured on video. At one point, Sydney and Rashad returned home, and Daryl left. Adrian was walking around "fine" and did not complain of leg pain after Daryl left, as Sydney later testified at trial. Sydney then left to run errands, leaving Adrian alone at home

3

with Rashad. When she returned, before entering the house, she heard Adrian screaming. When she went inside and asked Rashad why Adrian was "screaming like he [was] dying[,]" Rashad replied that he was just trying to change Adrian's diaper. Sydney then took Adrian with her to do another errand. At this time, she later recounted at trial, Adrian was "whimpering," though she could not tell if anything was wrong with his leg.

After returning home, Sydney noticed that Adrian "was holding onto the couch . . . [and] acting like he couldn't walk on his leg." At another point, she saw Adrian lying "balled on the ground." Despite this concerning behavior, she put Adrian in bed that night and went to sleep. The next morning on October 8, Sydney woke up, saw Rashad changing Adrian's diaper, and heard Adrian "hollering" again. Rashad told Sydney that he thought something was wrong with Adrian's leg. Now thinking that Adrian had a sprained ankle, Sydney took him to the hospital.

Doctors who examined and treated Adrian then concluded that he had a fractured leg. Dr. Garrett Barnes, who was working in the

emergency room that day, testified that Adrian showed a type of leg fracture that usually requires significant force, such as force from a high-height fall or a car accident. This fracture, he testified, was consistent with a fracture caused by an adult holding a child and slamming him down. Dr. Melissa Davis, a pediatrician who examined Adrian the next morning, recounted that Adrian had a severe fracture of his left tibia, which was rarely seen in children and usually needed very high energy to create, such as energy from a motor vehicle accident.

Doctors also observed other injuries on Adrian's body. They noticed that Adrian had scratches on his neck, which Dr. Davis noted seemed attributable to fingernails. Dr. Davis also observed other external injuries and marks, including: a 3.5-centimeter bruise on one of Adrian's cheeks; bruising on his chest; circular abrasions around his nipples that made her wonder if his nipples had been twisted; and severe bruising in his groin area, which was rare to find in young children, whose bruises often occurred on knees or elbows, places that could hit the ground if a child fell. Internally,

Dr. Davis found that Adrian had hepatitis (diffuse inflammation of the liver) that probably resulted from an "acute event."[2]

Suspecting abuse, Dr. Davis called the Georgia Division of Family and Children Services ("DFCS"), which then implemented a safety plan that temporarily placed Adrian and L. D. under the care of Sydney's mother, Joyce Greene, and that permitted only supervised contact between Sydney and her children while prohibiting contact between the children and Rashad.[3]

In February 2018, the children were returned to Sydney's custody. At this point, Sydney still lived with Rashad.

(b) *April 2018*

After the children were returned to Sydney's custody, she usually worked night shifts in Calhoun from 7:00 p.m. to 7:00 a.m., while Rashad worked in Cartersville from about 7:00 or 7:30 a.m. to

---

[2] Sydney gave several explanations for Adrian's injuries, including that he was playing with another child, that L. D. potentially stepped on his leg, and that Sydney rolled on top of him while they were napping on the couch. However, the doctors did not believe that Adrian's injuries were consistent with Sydney's explanations.

[3] No charges for Adrian's injuries, however, were brought against Rashad or Sydney at the time.

4:00 or 5:00 p.m. Sydney would usually return from work at about 7:40 a.m., and Rashad would usually leave for work at around 7:00 a.m. For a period of time, Sydney's sister would watch the children between when Rashad left for work and when Sydney got home. A few weeks before Adrian's death in April, however, Sydney asked her sister to stop watching the children, because Sydney did not want her sister to get "cussed out" by Rashad. After that, Adrian and L. D. were left alone from the time Rashad left for work until the time Sydney returned home.

(i) *April 12, 2018*

On the morning of April 12, Sydney, taking Adrian with her, dropped L. D. off at school and then ran errands with Adrian. After Sydney and Adrian returned home, she cleaned the house and he ran around. At one point, Adrian knocked a TV onto himself. Sydney picked him up, and after he "wiggl[ed] to get back down," she set him down and he continued to play.

Later that day, Sydney took Adrian to a bank to get a money order. Security footage and photos from the bank on April 12 at

around 1:30 p.m. captured Adrian looking around, playing with a toy, and reaching for and kissing Sydney, who smiled and laughed. Following the bank trip, Sydney took Adrian with her to pick up L. D. from school at around 2:30 to 2:45 p.m. A teacher at L. D.'s school, who saw Adrian in the car when Sydney came to pick up L. D., testified that Adrian appeared then "like he did every day when [she] spoke to him."

Sydney returned home with both children at about 3:00 p.m., fed them at about 4:30 p.m., bathed them, and then left for work at about 6:15 p.m. for her 12-hour shift, which began at 7:00 p.m.[4] Rashad returned home at some point between Sydney feeding the children and her leaving for work. When Sydney got her first break from work that night at around 9:00 or 10:00 p.m., she and Rashad spoke on the phone for about an hour. In that call, Sydney did not receive any indication from Rashad that anything was wrong with

---

[4] A supervisor at Sydney's workplace for the shift from 7:00 p.m. to 7:00 a.m. on April 12 to 13, 2018, testified that Sydney worked that shift and that she saw Sydney several times. Electronic timecards also showed that Sydney checked into work at about 6:50 p.m. on April 12 and clocked out at about 7:00 a.m. on April 13.

Adrian.

(ii) *April 13, 2018*

At about 2:30 a.m., Sydney received a text from Rashad asking her how hard Adrian had hit himself and telling her that Adrian had a mark on his head. Sydney returned to work, since at the time she "just didn't think it was . . . serious." Rashad then sent her a photo of Adrian's head with red marks on it that Sydney had not seen before she left for work. At about 3:00 a.m., Sydney texted that it was hard for her to concentrate at work.

Early in the morning at about 6:00 a.m., after Sydney texted Rashad to ask if he was up, he texted: "I hope this boy is okay [ ]b/c he acted like his [sic] is so sleepy." Sydney texted back that she was worried about Adrian. At about 6:50 a.m., as she was getting off work, she and Rashad spoke on the phone, and Rashad told her that Adrian had a seizure. In that call, Rashad also told Sydney that Adrian was okay before he left for work and that he had stuck a spoon in Adrian's mouth to keep his teeth from "chittering," causing a mark on his mouth.

Once Sydney got home, she picked up Adrian, but he would not wake up. At 8:03 a.m., Sydney called 911, reporting that Adrian had a seizure the night before.[5] Adrian was taken to Floyd Medical Center emergency department at 8:18 a.m. After about two hours there, Adrian was flown to Children's Healthcare of Atlanta.

Numerous medical personnel testified about their observations of Adrian on April 13. Nathaniel Rench, a paramedic who picked up Adrian that morning, recalled that Adrian seemed "lifeless" when Sydney handed him over, that Adrian had bruises "pretty much everywhere"—his face, body, limbs, genitals, legs, arms—and that the bruises seemed to be in different stages of healing. Additionally, Adrian's left pupil was swelling and was bigger than his right, which indicated to Rench that Adrian likely had a brain injury.

Dr. Cline Jackson, an emergency department doctor who treated Adrian on April 13, testified that: Adrian showed significant

---

[5] Before calling 911, Sydney called her friend Janelle, who advised her to call 911. She also had a call at 7:53 a.m. with Rashad, in which she asked what happened; Rashad said Adrian was okay before he left. Rashad and Sydney discussed calling 911, and at one point agreed they needed to call 911.

evidence of head trauma and life-threatening injury; he had bruises on his scalp, abdominal areas, his back, and the base of his penis; he had bruises on his shoulder blade, chest, and trunk, which seemed odd since children usually do not bruise these areas upon falling but instead have injuries in places where they catch themselves; his bruises were of "different ages," which indicated that Adrian had previous unreported injuries; and he had a low alertness and neurological function score. CT results also showed that Adrian had a fractured left seventh rib, which, Dr. Jackson testified, usually requires "a lot of trauma" to fracture, as children's ribs "are more cartilaginous" and harder to break than those of adults. Based in part on the different ages and locations of Adrian's bruises, and "[t]he fact that there was a previous visit or concern for non-accidental trauma," Dr. Jackson suspected abuse.

Dr. Jason Harrison, a neurosurgeon, also evaluated Adrian on the morning of April 13. Dr. Harrison testified that imaging revealed that large areas of the brain had not received blood for some time, which suggested to him that Adrian had suffered an injury multiple

11

hours prior to his evaluation rather than within the last hour. Based on the swelling that Dr. Harrison observed on Adrian's brain, he suspected that Adrian had suffered "significant brain trauma" that caused unconsciousness.

Later at trial, both Dr. Jackson and Dr. Harrison testified that Adrian's injuries did not appear to be caused by a TV falling on him. Dr. Jackson explained that a TV falling on Adrian's face likely would not have caused the injuries he had, given the kind of "intracranial hemorrhaging" that Adrian showed, and because the TV at Sydney's home appeared "a lot lighter" than other TVs and the "face is a really good shock absorber for the brain." Moreover, Dr. Jackson and Dr. Harrison indicated that the injuries that Adrian incurred were such that their symptoms would likely have shown up immediately or within two to four hours after the injury. A child with Adrian's injuries would likely not be alert and playing with toys right after the injury occurred, Dr. Harrison testified.

At 9:01 a.m., about 40 minutes after Adrian entered the emergency department, Rashad texted Sydney: "What did you tell

them what happen???" She replied: "Tv fell on him and symptoms showed around 2:30. But didn't think much bc he woke up and he went to bed where I woke him up this morning and I got no response[.]" Rashad then texted Sydney to ask if she "[told] them about the seizure[.]" Rashad soon arrived at the hospital: at about 9:40 a.m., he texted Sydney that he was "[i]n the front" and he "told them [he] was the daddy."

(c)  *Interviews with Law Enforcement*

While Sydney and Adrian were at the hospital's emergency department, Floyd County police officer Ojilvia Lom interviewed Sydney. In this interview, Sydney recounted that on April 12 at about 1:00 p.m., she heard a TV fall and found it on top of Adrian, who was against the rail of his sister's bed, but that he seemed fine that afternoon and evening. Sydney told Officer Lom that she was off work and at home with Rashad on the night of April 12.

After this interview, Officer Lom interviewed Sydney again, this time at Sydney's home with Rashad present. Sydney maintained that she found a TV on Adrian's face and his neck

13

against the bed on April 12. She stated again that she was off work the night of April 12. Rashad did not correct this statement, and also, told Officer Lom that on the morning of April 13, he was in Atlanta.

Later that day, Sydney went to the police station, where she was interviewed again and decided she "couldn't lie no more." She explained that the TV fell on Adrian sometime on April 12 after running errands with him in the morning and before picking up L. D. from school, but that Adrian seemed normal after she picked the TV up. In this interview, however, Sydney revealed that she was actually working and not at home on the night of April 12 to 13.[6]

On April 13, 2018, law enforcement also interviewed L. D., who was five years old at the time. L. D. recounted that Rashad was at home the night of April 12 to 13, and that Adrian was crying that night because Rashad "whooped him very hard."

---

[6] As Sydney explained, she had initially lied about being home the night of April 12 because she did not want to "lose [her] kids" and she was influenced by Rashad.

14

(d)    *Further Medical Treatment and Examination*

After Adrian was flown to Children's Healthcare of Atlanta, he underwent surgery to relieve pressure on his brain, but he died on April 15, 2018. Dr. Bryant, a child abuse pediatrics specialist who saw Adrian at Children's Healthcare from April 13 to 15, believed that his injuries resulted from non-accidental trauma. No single impact besides something like a high-height fall or car accident would have explained Adrian's injuries, Dr. Bryant testified: Adrian likely received multiple blunt traumas, or "some sort of force being applied to his body." Adrian not only had areas of bleeding and swelling in his brain, but also a liver laceration and healing fractures in multiple bones, including, as Dr. Bryant had observed in other abused children, bones near his wrist. It would take a "very significant amount" of force to lacerate a two-year-old's liver, Dr. Bryant testified, and she would not expect a laceration to be caused by a child "playing with someone or . . . another child." And, she explained, children with the kind of brain injury that Adrian had, likely would not "be happy and playful, walking around acting like

15

their normal self for a significant period of time" after incurring the injury.

Externally, she observed bruises on Adrian's abdomen, scrotum, left buttock, base of his neck, top and middle of his chest, as well as an abrasion on the underside of his penis. Dr. Bryant suspected abuse, in part because she usually saw bruises in areas that children injured in play, such as chins, shins, or areas with bones right underneath the skin—not "areas that are covered" such as the scrotum, buttocks, or penis.

After Adrian died, Dr. Lora Darrisaw, a medical examiner at the Georgia Bureau of Investigation, performed an autopsy on him. Dr. Darrisaw identified a red mark on the inner surface of his right ear, which she found significant since ears "are protected areas that don't often get injured in accidental-type events." She also found a few injuries inside his mouth and on his inner left cheek, which she testified were likely not the result of intubation from hospital treatment. Internally, she found that he had a liver laceration and tears in blood vessels supporting his small intestines, which she

16

thought were likely the result of significant trauma. Trauma also likely caused Adrian's other injuries, including: skull fracture indicating "something hit the head"; hemorrhages in soft tissues around Adrian's left kidney and testicle area, indicating abdominal trauma; bleeding under the dura (membrane-like material covering the brain), which she said was caused by severe trauma rather than surgery meant to treat the subdural bleeding; bleeding around the tissues in the back of the eye, suggesting severe trauma to the head; and bleeding in the tissue underneath Adrian's buttocks, suggesting that they had suffered impact.

Based on her examination, Dr. Darrisaw concluded that Adrian died from "traumatic injuries of the head and torso" that "appeared to be non-accidental" and classified his death as a homicide. She did not expect "simply jumping on a bed and falling off or [the] TV" to cause the injuries she found and this was in part why she concluded the death was a homicide.

2. Rashad contends that the trial court erred in denying his motion for a directed verdict because the evidence was insufficient

to sustain his convictions as a matter of constitutional due process and under Georgia's circumstantial evidence statute, OCGA § 24-14-6. "The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction." *Jones v. State*, 317 Ga. 466, 469 (1) (b) (893 SE2d 741) (2023) (citation and punctuation omitted). And when we review the sufficiency of the evidence as a matter of constitutional due process, we view the evidence presented at trial "in the light most favorable to the verdicts" and ask "whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Henderson v. State*, 317 Ga. 66, 72 (2) (891 SE2d 884) (2023). See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *Frazier v. State*, 308 Ga. 450, 452-453 (2) (a) (841 SE2d 692) (2020) (citation and punctuation omitted).

Under Georgia statutory law, a conviction may rest solely on circumstantial evidence if that evidence "exclude[s] every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. See *Willis v. State*, 315 Ga. 19, 23 (2) (880 SE2d 158) (2022). "[N]ot every hypothesis is a reasonable one," however, "and the evidence need not exclude every *conceivable* inference or hypothesis—only those that are reasonable." *Graves v. State*, 306 Ga. 485, 487 (1) (831 SE2d 747) (2019) (citation and punctuation omitted; emphasis in original). "[W]hether any alternative hypotheses are reasonable and whether the circumstantial evidence excludes any such hypotheses" are questions "for the jury" and "we will not disturb the jury's findings on those questions unless they are insupportable as a matter of law." *Willis*, 315 Ga. at 24 (2) (citation and punctuation omitted).

Here, the evidence was sufficient as a matter of constitutional due process to authorize a jury to find Rashad guilty beyond a

reasonable doubt of the malice murder of Adrian.[7] The testimony of multiple doctors indicated that Adrian's fatal injuries were the result of non-accidental, significant force generated by multiple blows. And evidence strongly indicated that these injuries were inflicted on the night of April 12 to 13, 2018 when only Rashad—not Sydney, who was working on night shift—was at home with Adrian and L. D. Before that night, Adrian appeared alert and conscious: security footage and photos showed him playing with a toy and kissing Sydney at around 1:30 p.m. on April 12; he appeared "like he did every day" to L. D.'s teacher around 2:30 to 2:45 p.m.; he was conscious and eating at around 4:30 p.m.; and Rashad did not

---

[7] Although Rashad purports to challenge the sufficiency of the evidence for each of his convictions except "Count 12," we evaluate the sufficiency of evidence only for Count 1 (malice murder). We do not review sufficiency for Counts 2, 4, 5, and 6 because those counts were either vacated by operation of law or merged. See *Anderson v. State*, 299 Ga. 193, 196 (1) n.4 (787 SE2d 202) (2016) (defendant's claims about sufficiency of evidence were moot for crimes that were vacated by operation of law or that merged with murder). Rashad states that he "does not contest the sufficiency of the evidence on Count 12, Cruelty to Children in the Third Degree." But Rashad's reference to Count 12 in his appellate briefing appears to be a scrivener's error because Rashad was actually convicted and sentenced only on Count 10 for cruelty to children in the third degree, so we also do not review the sufficiency of the evidence on Count 10.

indicate anything was wrong with him when Sydney and Rashad spoke on the phone at around 9:00 or 10:00 p.m. But on the morning of April 13, Adrian was unconscious, had bruises "pretty much everywhere," and showed significant evidence of head trauma and life-threatening injury. As doctors testified, he was likely injured immediately or two to four hours before the symptoms of his injuries appeared, and several hours prior to being evaluated on the morning of April 13. Then-five-year-old L. D. recounted that Adrian was crying that night because Rashad "whooped him very hard." And evidence suggested that Rashad had physically hurt Adrian in the past by bruising him and by fracturing his leg in October 2017. Based on all the evidence presented, the jury was authorized to conclude beyond a reasonable doubt that Rashad caused Adrian's death by beating him on the night of April 12 to 13, 2018. See *Johnson v. State*, 316 Ga. 672, 680 (2) (a) (889 SE2d 914) (2023) (evidence showing that victim suffered "non-accidental blunt force injuries during a time when [defendant] was the only person present and capable of inflicting such injuries" was "sufficient as a matter of

constitutional due process to support [defendant's] convictions for felony murder and cruelty to children in the first degree").

The evidence was also sufficient under OCGA § 24-14-6. Assuming without deciding that the evidence in this case was solely circumstantial and not direct,[8] the evidence authorized the jury to reject Rashad's alternate hypothesis that Adrian's fatal injuries resulted from a TV falling on his face causing his head to collide with a bedrail. Several experts testified that Adrian's injuries were non-accidental and that they did not expect those injuries to be caused by a TV falling on him. Dr. Darrisaw concluded that Adrian's death resulted from homicide. Moreover, as Doctors Jackson, Harrison, and Bryant indicated, the symptoms of Adrian's injuries probably appeared immediately or within two to four hours after the injuries occurred, thus suggesting that if a falling TV and hitting the bedrail caused Adrian's injuries, symptoms would have appeared immediately after the TV fell or on the afternoon of April 12. Yet

---

[8] See *Garay v. State*, 314 Ga. 16, 20 (2) (875 SE2d 631) (2022) ("if there is any direct evidence presented by the State, the circumstantial evidence statute does not apply to a sufficiency analysis").

evidence showed that Adrian was conscious, breathing, eating, and playing after the incident with the TV. Thus, the evidence was sufficient for the jury to reject as unreasonable the hypothesis that Adrian's death was caused by a falling TV.

3. Rashad next argues that his trial counsel provided constitutionally ineffective assistance. To prevail on a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced the defendant. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To show deficiency, a defendant must show that his attorney "performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms, which is no easy showing, as the law recognizes a strong presumption that counsel performed reasonably." *Scott v. State*, 317 Ga. 218, 221 (2) (892 SE2d 744) (2023) (citation and punctuation omitted). To show prejudice, a defendant "must establish a reasonable probability that, in the absence of counsel's

23

deficient performance, the result of the trial would have been different." *Moulder v. State*, 317 Ga. 43, 47 (3) (891 SE2d 903) (2023). "If a defendant fails to make a sufficient showing on one part of the *Strickland* test, we need not address the other part." *Scott*, 317 Ga. at 222 (2).

(a) Rashad first argues that his trial counsel provided ineffective assistance by failing to renew his objections to autopsy photos admitted during trial—specifically, the photos in the State's Exhibits 34-37, 40-45, and 61-62. Before trial, Rashad's trial counsel filed a motion in limine seeking to exclude various autopsy photos and photos that he claimed were gruesome and would inflame the jury. At a pretrial hearing, trial counsel stated that he sought to restrict the State's use of the autopsy photos to only those necessary to show Adrian's injuries. The trial court deferred ruling on the motion in limine at that time, but after conducting a hearing during the trial on the admissibility of autopsy photos including those in the State's Exhibits 34-37, 40-45, and 61-62, the trial court ruled that all the autopsy photos in these exhibits were admissible. These

24

autopsy photos were subsequently admitted without further objection from trial counsel.

Rashad contends that his trial counsel provided ineffective assistance by failing to renew his objection to these autopsy photos, because the trial court "erred" in admitting these photos and his trial counsel waived that error for review by failing to renew his objections.[9] Pretermitting whether the trial court abused its discretion in admitting the photos, we conclude that Rashad need not have renewed his objection to preserve the issue for appeal. "Once the court makes a definitive ruling on the record admitting or excluding any evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve such claim of error for appeal." OCGA § 24-1-103 (a). See *Anthony v. State*, 298 Ga. 827,

---

[9] Also, in connection with his ineffective assistance claims, Rashad asserts that the trial court "erred and abused its discretion in admitting State's Exhibit 32," a photo of Adrian undergoing emergency treatment on April 13, 2018. But this assertion fails as part of Rashad's ineffective assistance claim because that claim hinges on trial counsel's failure to renew his objection to autopsy photos, and here trial counsel objected to Exhibit 32 immediately before it was admitted during trial. And, insofar as Rashad makes this assertion of trial court error separate from his ineffective assistance claim, we deem that enumeration abandoned, because Rashad provides no argument or citation of authority to support it. See former Supreme Court Rule 22 (2023).

831-32 (4) (785 SE2d 277) (2016). Here, after Rashad's trial counsel moved in limine and asked in a pretrial hearing for the trial court to exclude unnecessary autopsy photos, and after the trial court conducted a hearing on the admissibility of the autopsy photos now listed in Rashad's appellate enumeration, the trial court definitively ruled that those photos were admissible, and they were later admitted at trial. Thus, trial counsel did not need to renew his objection to these photos to preserve the issue for appeal, and the failure to renew the objection did not constitute deficient performance.[10] See *Anthony*, 298 Ga. at 831-32 (4).

(b) Second, Rashad contends that his trial counsel gave ineffective assistance by failing to object or move for a curative instruction or mistrial after Sydney referenced Rashad's previous time in jail. When the State asked on direct about how she and

---

[10] Because Rashad's assertion that the trial court erred in admitting various autopsy photos is solely a part of his ineffective assistance claim and he does not assert a separate claim of trial court error, and because we have resolved that ineffective assistance claim by explaining that Rashad's trial counsel did not need to renew his objection to preserve the issue for appeal, we need not address whether the trial court actually erred or abused its discretion in admitting the autopsy photos listed in Rashad's appellate brief.

26

Rashad organized their finances, Sydney testified: "It was split. [Rashad] felt like since he moved up here from Atlanta, I should be paying that, and he should be getting on his feet since he just got out of jail." Rashad contends that his trial counsel performed deficiently by allowing this testimony, which Rashad characterized as "evidence of his bad character," to be heard by the jury even though the State had not given prior notice and the trial court had not decided admissibility under OCGA §§ 24-4-404 (b) ("Rule 404 (b)") and 24-4-403.

Pretermitting whether this testimony constituted other acts evidence under Rule 404 (b), we conclude that Rashad has not shown that his trial counsel "performed his duties in an objectively unreasonable way" by failing to object or to move for a curative instruction or mistrial. See *Scott*, 317 Ga. at 221 (2) (citation and punctuation omitted). Sydney's reference to Rashad's previous stint in jail was fleeting: She did not refer to why Rashad had been in jail, and after she made the jail reference, the State did not inquire into it any further. In this context, the reference likely had little

prejudicial effect on the jury, and raising an objection could have drawn further attention to the matter. As trial counsel testified, he did not seek a mistrial because he "really did not believe that" he had "adequate grounds" for one, and he did not object or seek a curative instruction because doing so would have drawn further attention from the jury to a comment "said in passing." These choices—at least some of which counsel himself indicated were "trial strategy" decisions—were not objectively unreasonable so as to constitute deficient performance. See *Blackshear v. State*, 309 Ga. 479, 486 (3) (847 SE2d 317) (2020) ("Trial tactics and strategy are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." (citation and punctuation omitted)); *Brewer v. State*, 301 Ga. 819, 820 (2), 821 (3) (804 SE2d 410) (2017) (trial counsel's "strategic decision" to decline a curative instruction so as "not to draw the jury's attention" to a witness's allegedly improper character testimony about using "jail booking information to locate" defendant, was "within the wide latitude of

28

presumptively reasonable professional conduct" (citation and punctuation omitted)).

(c) Next, Rashad argues that his trial counsel rendered ineffective assistance by failing to object or to move for a mistrial or curative instruction after Sydney's father Daryl testified about threats from Rashad at Daryl's workplace.

Daryl testified on redirect that he and Rashad had worked at the same location at one point; that after Adrian suffered a leg fracture in October 2017, Daryl told his workplace human resources department that he thought Rashad caused Adrian's leg injury so it would be best if Rashad were kept away from Daryl; and that Rashad almost hit him on three occasions with a piece of machinery used to unload trucks and said the words "dead man walking" to him.

Assuming, without deciding, that trial counsel performed deficiently by not objecting to Daryl's statements and that an objection would have led to the exclusion of the evidence, we conclude that Rashad has not shown a "reasonable probability that,

29

but for" this failure, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (III) (B). See also *Moulder*, 317 Ga. at 47 (3). As we showed in Division 2, the evidence of Rashad's guilt is very strong. In addition, Daryl's challenged statements stemmed from the properly admitted evidence that Rashad had broken Adrian's leg and caused other injuries which led to a DFCS investigation and the removal of the children from the home with orders that Rashad have no contact with them. That Daryl, as the children's grandfather, disliked Rashad as a result, and that Rashad acted out against Daryl was only marginally relevant, if at all, to the prosecution for Adrian's murder, and thus, had minimal probative value on the issue of whether Rashad committed Adrian's murder, making it unlikely to have caused a difference in the outcome of the trial. See *Olds v. State*, 299 Ga. 65, 75 (2) (786 SE2d 633) (2016) ("the probative value of evidence derives in large part from the *extent to which* the evidence tends to make the existence of a fact more or less probable" (emphasis in original)). Likewise, the evidence of Rashad's conduct toward Daryl

was not particularly prejudicial when viewed in context given that Rashad did not physically harm Daryl in these interactions and it was understandable that the two men did not like one another.

Accordingly, in light of the strong evidence of Rashad's guilt, we conclude that Rashad has failed to show a reasonable probability that, but for the alleged errors related to Daryl's testimony, the outcome of the trial would have been different. See *Naples v. State*, 308 Ga. 43, 54 (3) (a) (838 SE2d 780) (2020) (testimony that relatives of the child victim did not like the appellant, among other things, was not "particularly disparaging of [the appellant's] character when viewed in context, especially given the strength of the other admissible evidence against him"); *Toomer v. State*, 292 Ga. 49, 58-59 (4) (734 SE2d 333) (2012) (no prejudice from failure to object to bad character evidence, where such evidence was "buried in four long interview videotapes that were played during the testimony of three different witnesses" and where "the evidence of Appellant's guilt was strong"). Thus, Rashad has not shown prejudice, and his claim of ineffective assistance on this ground fails.

(d) Rashad also asserts that his trial counsel provided ineffective assistance by failing to object or to move for a curative instruction or mistrial after Sydney testified that Rashad threatened her father at his and Rashad's shared workplace. On direct, after Sydney spoke about Rashad's threats against her and Daryl—including Rashad's comment to her that he "watched [her] daddy go home"—the State asked: "Did [Rashad] make any other threats towards your dad?" Sydney responded: "I guess when they was working together."

Rashad argues that his trial counsel performed deficiently by failing to object or to move for a curative instruction or mistrial after this response. But at the motion for new trial hearing, trial counsel was not asked why he did not immediately object to or otherwise challenge Sydney's testimony on Rashad's workplace threats against Daryl, and "in the absence of evidence to the contrary, counsel's decisions are presumed to be strategic and thus insufficient to support an ineffective assistance of counsel claim." *Tabor v. State*, 315 Ga. 240, 244 (1) (882 SE2d 329) (2022) (citation

and punctuation omitted). In addition, that Rashad threatened Sydney's father was cumulative of earlier unchallenged testimony from Sydney that Rashad had threatened her father and others in her family. Under these circumstances, we conclude that Rashad has failed to carry his burden of showing that trial counsel's failure to object to Sydney's testimony was objectively unreasonable so as to constitute deficient performance. See *Blackshear*, 309 Ga. at 486 (3); *Snipes v. State*, 309 Ga. 785, 794 (3) (b) (iv) (848 SE2d 417) (2020) (counsel not deficient in failing to object to allegedly improper character evidence that was "largely cumulative of other admissible testimony"); *Sawyer v. State*, 308 Ga. 375, 384 (2) (b) (839 SE2d 582) (2020) (trial counsel not deficient in failing to object to cumulative testimony).

(e) Rashad finally asserts that counsel rendered ineffective assistance by failing to object or to move for a mistrial or for curative instructions to testimony by Greene that he characterizes as bad character evidence. Greene, when asked on direct whether Sydney seemed to "work" her DFCS case plan, replied: "No, because I think

[Rashad] was still around. He was still around." At the motion for new trial hearing, counsel testified that he did not object to this testimony because he did not think that the testimony was objectionable other than perhaps on the basis that it was speculative and, in any event, the challenged statement was brief.

We conclude that counsel was not deficient in failing to object to this testimony. Greene's challenged comment was fleeting and cumulative of other properly admitted evidence, including a former DFCS employee's testimony that Sydney did not comply with the DFCS plan by failing to be "forthcoming about incidents," as well as evidence indicating that Sydney had lied to law enforcement in the past due to Rashad's influence and that she and Rashad continued to live together after the start of the plan. It would not be objectively unreasonable for trial counsel, as a matter of trial strategy, to refrain from objecting to this testimony so as not to draw attention to it, particularly in light of other evidence from which the jury could have inferred that Sydney did not comply with the DFCS plan because Rashad was still around. See *Blackshear*, 309 Ga. at 486 (3);

34

*Brewer*, 301 Ga. at 821 (3). This claim for ineffective assistance also fails.[11]

*Judgment affirmed. All the Justices concur, except Warren, J., who concurs in judgment only in Division 3 (c).*

Decided February 6, 2024.

Murder. Floyd Superior Court. Before Judge Sparks.

*Katherine M. Mason*, for appellant.

*Leigh E. Patterson, District Attorney, Emily G. Johnson, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.

---

[11] Finally, to the extent that Rashad claims he was deprived of a fair trial due to the cumulative prejudice resulting from his trial counsel's errors, see *Scott*, 317 Ga. at 226 (3) n.5 (referencing *Schofield v. Holsey*, 281 Ga. 809, 811 (II) n.1 (642 SE2d 56) (2007)), we need not address this claim because "we have assumed deficiency in only one instance" and Rashad "has failed to establish any other instance of deficiency." See *Scott*, 317 Ga. at 226 (3).